UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

MARTIN GOTTESFELD, Petitioner,
*pro se*,

v.

T. RULE, Warden of The
Federal Correctional Institution,
Terre Haute, Indiana,
Respondent.

No. 2:22-cv-571-JRS-MJD.

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2241)

1. MARTIN GOTTESFELD, Petitioner, *pro se*, pursuant to 28 U.S.C. § 2241, hereby applies for a writ of habeas corpus commanding Mr. T. RULE, Respondent, warden of the Federal Correctional Institution (FCI) Terre Haute, Indiana, to effect

1) Petitioner's **IMMEDIATE RELEASE** from prison;

2) the reduction of Petitioner's sentence by one year for residential drug-abuse treatment to which Petitioner is entitled but of which Respondent deprived Petitioner without due process;

3) a grant of at least 111 days of First Step Act (FSA) time credits of which Respondent deprived Petitioner but to which Petitioner is entitled by correct statutory construction;

4) the return of 27 days earned good-conduct-time (GCT) that Respondent unconstitutionally took from Petitioner as a result of Bureau of Prisons (BOP) incident report (IR) 3338082 (hereinafter the "Court-access IR");

5) the return of a further 27 days GCT that Respondent unconstitutionally withholds from Petitioner as a result of BOP IR 3549119 (hereinafter the "RT IR");

6) the disqualification of the use of BOP IR 3552752 (hereinafter the "TAC IR") to lengthen in any way Petitioner's confinement; and

7) a grant of credit for 122 days and counting towards Petitioner's three-year supervised-release term for 1) all days Petitioner wrongfully served in prison since his rightful release date Oct. 22, 2022, and 2) his leftover FSA credit.

## I. This Court has jurisdiction and relief is available.

2. "Writs of habeas corpus may be granted by [...] the district courts [...] within their respective jurisdictions." 28 U.S.C. § 2241(a). "The plain language of the habeas statute thus confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004).[1] "The writ of habeas corpus shall not extend to a prisoner unless—(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or [...] (3) He is in custody in violation of the Constitution or laws or treaties of the United States." § 2241(c).

3. Petitioner is a federal prisoner, registration no. 12982-104.

4. Petitioner is in the immediate physical federal custody of Respondent Warden Mr. T. RULE at the FCI Terre Haute, Indiana, inside this Court's district, The Southern District of Indiana.

5. No detainer is lodged against Petitioner; he has no charges pending in any state or federal court; and Petitioner is a natural-born U.S. citizen and 2002 high school graduate.

6. Petitioner was committed to Respondent's custody as a result of Petitioner's sole conviction and 121-month sentence, imposed Jan. 10, 2019. *See* Sentencing Tr., Jan. 10, 2019; Judgment, Jan. 11, 2019; *United States v. Gottesfeld*, 16-cr-10305-NMG (D. Mass.) ("Crim. Case").[2]

7. Petitioner hereby asserts he has overserved his sentence by 122 days and was entitled to a quantum change in custody to community confinement 169 days ago and counting, on July 17, 2022.

---

[1] Once obtained, however, jurisdiction is unaffected by a respondent's later transfer of a petitioner outside the Court's district. *In re Hall*, 988 F.3d 376, 378 (7th Cir. 2021) (distinguishing *Rumsfeld* from *Ex Parte Endo*, 323 U.S. 283 (1944) and rescinding case transfer). Petitioner objects to any transfer of the case at bar based upon Respondent's later transfer of Petitioner.

[2] The other details of the Crim. Case are irrelevant to this petition except to the extent they give rise to inferences of Respondent's retaliation against and suppression of Petitioner's protected conduct. *See, e.g.*, Michelle Malkin, *#FreeMartyG: Exposing America's Secret Prisons*, Creators Syndicate (Jan. 21, 2022), available at https://www.cnsnews.com/commentary/michelle-malkin-freemartyg-exposing-americas-secret-prisons ("Marty Gottesfeld, 37, is an American political prisoner"); David Kushner, *The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison*, Rolling Stone (June 27, 2017), available at https://www.rollingstone.com/culture/culture-features/the-hacker-who-cared-too-much-196425. The government ultimately failed to prove the moral core of its case against Petitioner. *See* Verdict Form, Crim. Case (jury refused to convict under 18 U.S.C. § 1030(c)(4)(B)(i), (A)(i)(ii) ("the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment or care of 1 or more individuals")).

"[Section] 2241 is used for [...] challenges to the fact or duration of confinement." *Walker v. O'Brien*, 216 F.3d 626, 629 (7th Cir. 2000) (citing *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 2000); *Carina v. United States*, 974 F.2d 924, 927 (7th Cir. 1992)). "[I]f a prisoner claims to be entitled to probation or bond or parole, his proper route is habeas corpus, even though he is seeking something less than complete freedom." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991).

8. Petitioner expressly disavows any construal of this petition as one seeking damages or any non-habeas relief. *See Castro v. United States*, 540 U.S. 375 (2003) (district court must warn *pro se* litigant before construing his pleading in a way that may deprive him of his rights).

## II. The order to show cause

9. "A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243.

10. "The writ, or order to show cause shall be directed to the person having custody of the person detained." § 2243. "It shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed." *Id.*

11. Every day Petitioner remains in prison is an injustice; Petitioner objects to any time exceeding three days in which for Respondent to answer the forthcoming Order to Show Cause, especially given that Respondent read this Amended Petition and its predecessor days or a week before they reached the Court. *See, e.g.*, 28 C.F.R. § 540.203 (mail to U.S. courts and judges is read for contents); Court-access BP-11 Cent. Office's Resp. (Nov. 21, 2019) ("all incoming and outgoing mail[...] must be properly and thoroughly reviewed"), *Gottesfeld v. Lammer*, 2:20-cv-12-JRS-MJD (S.D. Ind.) (hereinafter *Lammer*), dkt. 100-58 at 2. Thus Respondent has already had ample time to prepare his arguments.

## III. Maintaining controversies

12. Petitioner may "deny any of the facts" in Respondent's upcoming Return. 28 U.S.C. § 2243. But he need not do so to maintain factual disputes. 28 U.S.C. § 2248. As explained more

than 70 years ago:

> We read [28 U.S.C. § 2248] as not requiring a traverse when a factual issue has been clearly framed by the petition and the return or answer. This section provides that the allegations of a return or answer to an order to show cause shall be accepted as true if not traversed, except to the extent the judge finds from the evidence that they are not true. This contemplates that where the petition and return or answer do present an issue of fact material to the legality of detention, evidence is required to resolve that issue despite the abscence of a traverse. The reference to evidence assumes a hearing on issues raised by the allegations of the petition and the return or answer to the order to show cause.

*Steward v. Overholser*, 186 F.2d 339, 342 n. 5 (D.C. Cir. 1950). *See also* Original Committee Note to § 2254 Rule 5 (quoting same) ("It seems that when the petition and return pose an issue of fact, no traverse is required").

13. Thus, the committee noted:

> In actual practice, the traverse tends to be a mere pro forma refutation of the return, serving little if any expository function. In the interests of a more streamlined and manageable habeas corpus procedure, it is not required except in those instances where it will serve a truly useful purpose. Also, under rule 11 the court is given discretion to incorporate Federal Rules of Civil Procedure where appropriate, so civil rule 15(a) may be used to allow the petitioner to amend his petition when the court feels this is called for by the contents of the answer.

*Id. See also United States ex rel. Kendzierski v. Brantley*, 447 F.2d 806, 808 (7th Cir. 1971) ("Even if factual statements in the return are not traversed, they may be rejected 'to the extent that the judge finds from the evidence that they are not true'") (quoting 28 U.S.C. § 2248, limiting returns to "qualified credence").

14. Also, "complaints need not anticipate or meet potential affirmative defenses." *Richards v. Mitchell*, 696 F.3d 635, 638 (7th Cir. 2012). "Exhaustion is an affirmative defense, and the burden of proof is on" Respondent. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). "Moreover, a court's 'deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute.'" *Williams v. Lane*, 851 F.2d 867, 872 (7th Cir. 1988) (quoting *Campbell v. Miller*, 787 F.2d 217, 227 n. 17 (7th Cir. 1986), *cert. denied* 479 U.S. 1019). When prison officials "confused deference with credibility in their arguments," the district court properly "weighed the evidence and carefully considered what was argued before it." *Id.*

## IV.  Rightful calculation of Petitioner's sentence and time credits

15.  "A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." 18 U.S.C. § 3585(a).  Under this statute the BOP calculates a raw estimated full-term date ("Raw EFT") for each prisoner "by adding the total length of the sentence to be served to the beginning date of the sentence resulting in a full term date of sentence (*Raw EFT*) that does not include any time credit, e.g., presentence or prior custody time or good time." U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5880.28, Change Notice 7, Sentence Computation Manual (CCA of 1984) (July 19, 1999) ("Sent. Comp. Man.") at ch. 1.3(c) (emphasis in original). *See also id.* at ch. 1.3(b) (citing § 3585(a)).

16.  "The Bureau of Prisons calculates any part of a day in custody serving sentence[*sic*] as a *full day* served on the sentence and any part of a day in official detention as a *full day* for prior custody time credit purposes." *Id.* (emphasis in original) (citing Chapter I, paragraph 3.d, third subp.; 3.c.(1)).[3]

17.  Petitioner was sentenced to an aggregated 121-month prison term on Jan. 10, 2019. *Supra,* ¶ 6 (citing Sentencing Tr., Judgment).

18.  Using the BOP's method, Petitioner's Raw EFT is Feb. 9, 2029. *See* Sent. Comp. Man. at ch. 1.3(e-1)(b) Example 3 (aggregated 120-month term runs from June *15*, 1988, to June *14*, 1998).

19.  The BOP calculates prior-custody time credit, or "jail credit," as a whole number of days then applies prior-custody time credit day-for-day to the Raw EFT. *Id.* at Manual SRA Sentence Computation Example No. 1 (crediting 24 days prior-custody time for six-month sentence imposed Feb. 25, 1989, after detention on Feb. 1, 1989). Petitioner was arrested on the Crim. Case complaint Feb. 17, 2016. *See* Arrest Warrant Ret., Crim. Case. Petitioner was then continuously detained until sentencing, solely awaiting disposition of the Crim. Case. He thus earned 1059 days prior-custody time credit towards his sentence from Feb. 17, 2016, through Jan. 10, 2019.

---

[3] The BOP thus purportedly awards a defendant detained pending sentencing and remanded directly thereafter credit for the day of sentencing as both one full day of jail credit and one full day served on the sentence, although some of the BOP's examples in Sent. Comp. Man. seem to indicate otherwise.

20. Petitioner's prior-custody-time-credit release date, i.e. 1059 days before his Raw EFT of Feb. 9, 2029, is Mar. 18, 2026. As one would expect, this is ca. 121 months after his arrest.

21. Next to calculate is statutory GCT: "The Bureau will award inmates up to 54 days of GCT credit for each year of the sentence imposed by the court. Consistent with this methodology, the Bureau will initially determine a projected release date by calculating the maximum GCT credit possible based on the length of an inmate's imposed sentence." 28 C.F.R. § 523.20(b)(1) (Feb. 11, 2022); 87 FR 7938, 7943.[4,5] "BOP calculates the projected GCT credit to be awarded for any portion of a sentence that is less than a full year at a prorated amount." 28 C.F.R. § 523.20(b)(2) (Feb. 11, 2022).[6] The BOP has verified Petitioner's high-school diploma. *See* Individualized Needs Plan—Program Review (Dec. 7, 2022) at Current Education Information ("COMPLETED GED OR HS DIPLOMA 06-11-2019"), Exh. 1 at 1. Petitioner thus earns the full 54 days of GCT per year. *See* 28 C.F.R. § 523.20(d)(2)(i) (high-school graduates earn the full 54 days GCT per year); 87 FR 7938, 7943 (same). *See also, supra,* ¶ 5 (Petitioner graduated high school in 2002).

22. Ergo, the "maximum GCT credit possible" on Petitioner's 121-month sentence is 544 days, i.e. 54 days per 12 months plus 4 days prorated credit for the one-month remainder. *See* Table 1, 87 FR 7940 (showing four days prorated GCT for one-month remainders on 25- and 37-month sentences). Applied to Petitioner's prior-custody-time-credit release date of Mar. 18, 2026, Petitioner's GCT statutory release date (SRD) is Sept. 20, 2024.

23. Next, Respondent has found Petitioner eligible for a full-year statutory credit toward his sentence for participation in the BOP's Residential Drug Abuse Program (RDAP, pronounced *ahr-dapp*). *See* 18 U.S.C. § 3621(e)(2)(B).[7] "The Bureau interprets the statutory language [of § 3621(e)(2)(B)] to mean that any sentence reduction of *one year or less* shall be deducted from the

---

[4] Citations to *The Federal Register* take the form *Vol.* FR *Pg. [Jump Cite] [(Date)]*.

[5] This new method implements the FSA and supersedes the corresponding method from Sent. Comp. Man. The BOP is yet to update Sent. Comp. Man. to reflect the FSA's changes.

[6] The BOP still appears to prorate partial-year GCT as 0.148 days GCT per day served, generally rounded down to the nearest whole number of days. *See* Sent. Comp. Man. at ch. 1.3(g).

[7] The BOP's criterion for RDAP awards of less than a year's sentence credit is inapplicable to Petitioner. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5331.02, Change Notice 2, Early Release Procedures Under 18 U.S.C. § 3621(e) (Sept. 27, 2017) at chs. 5–10 ("This policy enacts the § 3621(e) early release based on an inmate's sentence length," with credit limited only for sentences under 37 months) (citing 28 C.F.R. § 550.55(c)).

projected SRD." Sent. Comp. Man. at ch. 1.3(k) (emphasis in original). "The date produced as a result of the tentative sentence reduction shall be termed the *3621(e) Release Date*." *Id.* (emphasis in original). "SENTRY," i.e. the BOP's core business application, "is programmed to subtract one year from the projected SRD to produce the tentative *3621E Release Date*." *Id.* (emphasis in original). Thus, Petitioner's 3621E Release Date is Sept. 20, 2023.

24.  The Community Transitional Drug Abuse Treatment Program (TDAT, pronounced *tee-datt*) "is the third component of the RDAP." U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5330.11, Change Notice 1, Psychology Treatment Programs (Apr. 25, 2016) at § 2.7.1 Target Population. "For inmates to successfully complete all components of RDAP, they must participate in TDAT in the community. If inmates refuse or fail to complete TDAT, they fail the RDAP and are disqualified for any additional incentives." *Id.* (quoting 28 C.F.R. § 550.56(a)). "Ordinarily, inmates who participate in the TDAT must receive no less than a 120-day placement in an RRC [residential re-entry center, i.e. halfway house]. It is not always possible to complete transitional drug abuse treatment in less than 120 days." *Id.* at § 2.7.2 RRC Placement.

25.  Petitioner's TDAT community-confinement date—120 days before his 3621E Release Date of Sept. 20, 2023—is May 23, 2023.[8]

26.  Last, because Petitioner is eligible for FSA time credits,[9] Petitioner's FSA time credits are applied: federal time credits (FTCs) "may be applied toward early release in addition to the early release benefit for RDAP graduates; however, inmates are still required to complete the required 120-day RRC/[home confinement] placement [TDAT]." *See* FCI Unit Team, *Inmate Message— Federal Time Credits (FTC) Auto-Calculation Launches* (Sept. 7, 2022) ("FCI Unit Team Msg. Sept. 7, 2022") at 2, dkt. 1-1 at 2.

27.  "A prisoner shall earn 10 days of time credits for every 30 days of successful partici-

---

[8] Petitioner recognizes that time spent in TDAT counts toward a sentence and is not supervised release. Petitioner asserts TDAT is a "quantum change in the level of custody." *Graham*, 922 F.2d at 381 (citing *Brennan v. Cunningham*, 813 F.2d 1, 4–5 (1st Cir. 1987); *Miller v. McCollum*, 695 F.2d 1044, 1046 (7th Cir. 1983)). Even exempting TDAT, however, Petitioner is entitled to immediate release. *See, infra*, ¶ 37, Table 1 (Petitioner's release date absent TDAT was Oct. 22, 2022).

[9] Only prisoners serving sentences under expressly excluded statutes are ineligible for FSA time credits. *See* 18 U.S.C. § 3632(d)(4)(D) (excluded statutory violations). BOP paperwork and records unambiguously state that Petitioner is in fact eligible to earn and apply FSA credits. *See, e.g.*, Individualized Needs Plan—Program Review at 1 ("Proj. Rel. Mthd: FIRST STEP ACT[...]"), Exh. 1.

pation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5410.01 First Step Act of 2018—Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4) (Nov. 18, 2022) ("FSA Time Credit Proc.") at ch. 6 (quoting 28 C.F.R. § 523.42(c)(1)) (same). "A prisoner determined by the Bureau of Prisons to be at a minimum or low risk of recidivating, who, over 2 consecutive [risk] assessments, has not increased [his] risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation." 18 U.S.C. § 3632(d)(4)(A)(ii); FSA Time Credit Proc. at ch. 6 (quoting 28 C.F.R. § 523.42(c)(2)) (same). "A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed [...] prior to [Dec. 21, 2018]." 18 U.S.C. § 3632(d)(4)(B)(i). *See also* FSA Time Cred. Proc. at ch. 6 (quoting 28 C.F.R. § 523.42(b)(1)) (same). "An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020." *Id.* (quoting 28 C.F.R. § 523.42(b)(2)). But, "A prisoner may not earn time credits under this paragraph [...] during official detention prior to the date that the sentence commences under [18 U.S.C. §] 3585(a)." 18 U.S.C. § 3632(d)(4)(B)(ii). *See, supra,* ¶ 15 (quoting § 3585(a)).

28. "Time Credits for successful participation are awarded at the end of each thirty-day period." 87 FR 2705, 2711.[10]

29. Due to "administrative difficulties," the BOP announced on Jan. 19, 2022: "Eligible inmates will be afforded a presumption of participation for the period between December 21, 2018, and January 14, 2020 and be awarded Time Credits accordingly." 87 FR 2705, 2708.[11]

---

[10] The BOP seems to keep a running tally of each eligible prisoner's FSA-participation days and to carry-over remainders, such that, *e.g.*, an eligible prisoner who participates for 45 days from Apr. 1st through May 15th, then stops participating, before continuing again to participate a further 15 days from June 1st through June 15th, would be awarded FSA time credits on Apr. 30th and again on June 15th.

[11] The BOP initially also claimed: "Inmates will not receive credit for any period in which they were in a special housing unit." *Id.* More recently, however, the BOP reversed that stance, telling Petitioner: "you will be able to earn credit while in administrative detention [in a SHU]." *See* FCI Legal Dept., Inmate Message First Step Act Time Credits Calculation (Nov. 18, 2022) ("FCI Legal Dept. Msg. Nov. 18, 2022") at 2, *presum.* dkt. 1-2 at 2. In any event, Petitioner is prepared to show he was deprived of due process during his two potentially relevant periods of administrative detention: Feb. 15 through Mar. 31, 2019, and Dec. 9, 2019, through Jan. 14, 2020. Petitioner "has a protected liberty interest in his good-time credits and credit-earning class, and he

30. Under 18 U.S.C. §§ 3585(a), 3632(d)(4)(B)(ii), Petitioner's sentence formally commenced Jan. 10, 2019. *See, supra,* ¶ 6 (Petitioner's sentence was imposed Jan. 10, 2019). He was thus presumed to have participated for 370 days from Jan. 10, 2019, to Jan. 14, 2020.[12]

31. "During the 'presumed participation' period and through April 28, 2021, the PATTERN [recidivism] risk level calculated on April 28, 2021 (PATTERN auto-calculation start date), will be used to determine the initial risk level and FTC earning rate." FCI Unit Team Msg. Sept. 7, 2022, at 1. Petitioner's PATTERN risk level was first assessed as low ca. Jan. 14, 2020. To his knowledge, it has remained low ever since.

32. During presumed participation the BOP appears to allot to low-recidivism-risk prisoners, including Petitioner, 10 days of FSA credit for their first 30 days participation then 15 days of credit per 30 days participation thereafter.[13] Using this method, Petitioner earned 175 days time

may not be deprived of either without the minimum requirements of due process." *Calligan v. Wilson,* 362 F. App'x 543, 545 (7th Cir. 2009) (citing *Piggie v. McBride,* 277 F.3d 922, 924 (7th Cir. 2002)). But he was never afforded an administrative-detention order or hearing from Feb. 15 through Mar. 31, 2019. *See* Affidavit of Martin Gottesfeld, Mar. 11, 2019, at 1, ¶ 7 ("I have never been advised of any administrative detention hearing nor administrative detention order regarding the [...] 23 days and counting from the night of Friday, February 15, 2019, through the present"), *Gottesfeld v. Hurwitz, et al.,* 18-cv-10836-PGG-GWG (S.D.N.Y.) (hereinafter *Hurwitz*), dkt. 13 (entered Mar. 15, 2019). And he was afforded no administrative-detention hearing from Dec. 9, 2019, through Jan. 14, 2020. *Contrast:* "Within seven continuous calendar days of your placement in either administrative detention or disciplinary segregation status, the [segregation review official] will formally review your status at a hearing you can attend." U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5270.11 Special Housing Units (Nov. 23, 2016) at ch. 7 (quoting 28 C.F.R. § 541.26(b)). Petitioner asked for but did not receive "a BP-8" on Feb. 15, 2019. Affidavit of Martin Gottesfeld, Mar. 11, 2019, at 3, ¶ 26.

[12] Petitioner acknowledges the BOP's statement when it announced the presumed-participation period: "Inmates will not receive credit for any period in which they were in a special housing unit, in a designation status outside the institution, [or] temporarily transferred to the custody of another Federal or non-Federal government agency." 87 FR 2705, 2708. The BOP already reversed some of these provisos, *supra,* n. 11 (SHU no longer disqualifying); FCI Legal Dept. Msg. Nov. 18, 2022, at 2 ("you will be able to continue earning credit while in the community"), *presum.* dkt. 1-2 at 2. To Petitioner's knowledge he was never "in a designation status outside the institution," such as a halfway house or home confinement, or "transferred" *from* the BOP "to the custody of another" agency. The BOP seems to agree. *See* FSA Recidivism Risk Assessment of Martin Gottesfeld, Aug. 23, 2022 ("Start Incarceration..: 01/10/2019"), *presum.* dkt. 1-3. And under lenity Petitioner should not now be denied credit based on ambiguous, non-statutory, non-regulatory language adopted retrospectively, especially when, as here, had Petitioner known at the time between his sentencing and BOP entry, he could have and would have commenced court and other protected actions to secure his unambiguous credit-earning status earlier.

[13] Mr. Allen Pillow, for example, was presumed to participate for 211 days "from June 7, 2021, through December 25, 2021," and scored "at a low risk for recidivating." *Pillow v. Bureau of Prisons,* 2022 U.S. Dist. LEXIS 192489, No. 4:22-cv-713 PSH (E.D. Ark. Oct. 21, 2022) at *9, ¶¶ 5-6. The BOP ultimately awarded Pillow 100 days of credits for his 211 days participation. *Id.* at ¶¶ 5, 14. From this the logical inference is the BOP awarded Pillow 10 days credit for his first

credits for his 370 days presumed participation from Jan. 10, 2019, to Jan. 14, 2020, and a remainder of 10 days of participation to carry forward.

33. The BOP next offered Petitioner FSA participation ca. spring 2021 in the form of a drug-education class at FCI Terre Haute. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, *Evidence-based Recidivism Reduction (EBRR) Programs and Productive Activities (PA)* ("EBRR & PA List") (posted by the FCI Re-entry Affairs Dept. Feb. 24, 2020) at 3, second row ("Drug Education" is an FSA productive activity), *presum.* dkt. 1-4 at 4. Petitioner cannot recall the exact duration of the course. It was approx. 10 weeks. Petitioner passed the class with a perfect score. *See* Individualized Needs Plan—Program Review at 1, Current Drug Assignments ("DRUG EDUCATION COMPLETE 07-08-2021"), Exh. 1 at 1.

34. Petitioner's approx. 10 weeks, or 70 days, of drug ed., added to his 175 days time credit and 10 days carry-over participation, yielded another 30 days FSA credit with a 20-day carry-over remainder, for a total of 205 days time credit ( ( 10 days carry-over participation + 70 days new participation) / 30 days participation per credit-earning block = 2 credit-earning blocks + 20-day carry-over participation remainder; 175 days time credit + 2 credit-earning blocks * 15 days credit per block + 20 days carry-over participation = 205 days time credit plus 20-day carry-over remainder).

35. Adjusting Petitioner's 3621E Release Date of Sept. 20, 2023, forward 205 days as of ca. Jan. 19, 2022, when the BOP announced the presumed-participation period, yielded Petitioner's FSA-adjusted 3621(e) Release Date of Mar. 10, 2023. And adjusting Petitioner's TDAT community-confinement date of May 23, 2023, forward 205 days yielded Petitioner's FSA-adjusted TDAT date of Oct. 30, 2022.

36. Under the FSA, the BOP was required to "provide [...] evidence-based recidivism reduction programs and productive activities for all prisoners before" Jan. 15, 2022. 18 U.S.C. § 3621(h)(2)(A). Nevertheless, across the BOP, FSA programs remain unforthcoming. In the meantime, the BOP once again effectively presumes participation for prisoners, including Petitioner, who timely complied with all needs assessments and program sign-ups. *See, generally,* FCI Legal Dept. 30 days participation, then 15 days of credit for each of the six remaining 30-day participation periods (10 + (15 x 6) = 100).

Msg. Nov. 18, 2022 (discussing "needs assessments" and establishing a "grace period" "until December 31, 2022," in which for prisoners to complete needs assessments and sign-ups), *presum.* dkt. 1-2.

37.  Remembering Petitioner's prior 205 days FSA credit and 20-day participation carry-over, *supra,* ¶ 34, Petitioner continued earning FSA credit and advancing his TDAT and release dates.

### Table 1—2022 FSA Dates & Earnings

| Date | Total Days Earned | TDAT Date | Release Date |
|---|---|---|---|
| Jan. 25, 2022 | 220 | Oct. 15, 2022 | Feb. 23, 2023 |
| Feb. 24, 2022 | 235 | Sept. 30, 2022 | Feb. 8, 2023 |
| Mar. 26, 2022 | 250 | Sept. 15, 2022 | Jan. 25, 2023 |
| Apr. 25, 2022 | 265 | Aug. 31, 2022 | Jan. 10, 2023 |
| May 25, 2022 | 280 | Aug. 16, 2022 | Dec. 26, 2022 |
| June 24, 2022 | 295 | Aug. 1, 2022 | Dec. 11, 2022 |
| July 24, 2022 | 310 | July 17, 2022* | Nov. 26, 2022 |
| Aug. 23, 2022 | 325 | | Nov. 11, 2022 |
| Sept. 22, 2022 | 340 | | Oct. 27, 2022 |
| Oct. 22, 2022 | 355 | | Oct. 12, 2022** |
| Nov. 21, 2022 | 370 | | |
| Dec. 21, 2022 | 385*** | | |

* On July 24, 2022, Petitioner's TDAT date became impossible, effectively advancing to July 17, 2022. Petitioner should have been released to TDAT with seven days credited to his supervised release.

** Even without TDAT, Petitioner's FSA-adjusted 3621E Release Date became impossible on Oct. 22, 2022, when it would have advanced to Oct. 12, 2022. Petitioner should have been released with 10 days credited to his supervised release.

*** Similarly, as of Dec. 21, 2022, Petitioner had served 70 days of his supervised-release term in prison and earned a further 40 days FSA credit.

38.  As of today, Mon., Jan. 2, 2023, Petitioner has served 82 days of his supervised-release term in prison and earned a further 40 days of FSA credit. Thus, Petition is entitled to immediate release.[14] And if released today, Petitioner should be credited 122 days toward his supervised release (82 days overserved + 40 days FSA credit = 122 days total credit).

### V.  Respondent must credit Petitioner for RDAP.

39.  Respondent had until the end of fiscal-year 1997 to make the RDAP available to "all eligible prisoners." 18 U.S.C. § 3621(e)(1)(C).

---

[14] Even if denied the 120 days for TDAT, the 54 days contested GCT and the 111 days contested FSA time credit, i.e. applying only the one-year credit for RDAP under § 3621(e)(2)(B) and the 274 days FSA credit that the parties seem to agree is due, Petitioner's release date would be Mar. 14, 2023—less than three months from the filing date of this amended petition.

40. And Respondent has unambiguously determined that Petitioner is eligible for RDAP. *See* Gauthier, C. Psy.D., Bureau of Prisons Psychology Services RDAP—Diagnostic Interview of Martin Gottesfeld (REDACTED) at 2 ("A review of available documentation reveals that inmate GOTTESFELD is QUALIFIED to participate in the Residential Drug Abuse Program (RDAP)"), *presum.* dkt. 1-5 at 2; Individualized Needs Plan—Program Review at Current Drug Assignments ("RESIDENT DRUG TRMT QUALI-FIED 04-20-2022"), Exh. 1 at 1.

41. Respondent has further determined that Petitioner is eligible for a one-year sentence credit for completing RDAP. *See* Form BP-A0942 Request for § 3621(e) Offense Review of Martin Got-tesfeld at 2 ("Based on the above criteria and analysis, this inmate's current and/or prior of-fense(s)[...] DOES NOT PRECLUDE him/her from early release pursuant to 18 U.S.C. § 3621(e)(2)(B)"), *presum.* dkt. 1-6 at 2; Individualized Needs Plan—Program Review at Current Drug Assignments ("18 USC 3621 RELEASE ELIGIBLE 04-22-2022"), Exh. 1 at 1; 18 U.S.C. § 3621(e)(2)(B) ("The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program [RDAP] may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve").

42. Compounding the 25-year-old deadline under § 3621(e)(1)(C) to make RDAP available to all eligible prisoners such as Petitioner, the FSA required Respondent to make evidence-based recidi-vism-reduction program (EBRRs) available to all prisoners before Jan. 15, 2022. 18 U.S.C. § 3621(h)(2)(A).

43. In turn, the BOP long ago declared that RDAP is an FSA EBRR. *See* EBRR & PA List at 1, ninth row ("Residential Drug Abuse Treatment Program (RDAP)"), *presum.* dkt. 1-4 at 2.

44. And Respondent has determined under the FSA that Petitioner needs RDAP. *See* Individual-ized Needs Plan—Program Review at 2, Current FSA Assignments ("NEED—SUBSTANCE ABUSE YES"), Exh. 1 at 2.

45. The BOP has two criteria for RDAP sentence reductions under 12 months, i.e. 1) sentences under 37 months and 2) the need to complete community treatment. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5331.02, Change Notice 2, Early Release Procedures Under 18 U.S.C. § 3621(e) (Sept. 27, 2017) at ch. 10 Length of Sentence.

46. Both of the above criteria are inoperative at bar. Petitioner's sentence is 121 months, more than three times the 37 months required for the full year's credit. And any need to complete community treatment became moot on Oct. 22, 2022, once Petitioner had overserved his sentence, *supra*, ¶ 37, Table 1—2022 FSA Dates & Earnings.

47. Indeed, "the BOP has decided ... that all eligible inmates who successfully complete[] the 500 hour residential drug and alcohol treatment program [will] receive a one-year reduction to his or her sentence." *Hines v. Crabtree*, 935 F. Supp. 1104, 1110 (D. Or. 1996) (quoting Answer of FCI Sheridan Warden Joseph H. Crabtree) (ellipsis and alterations in *Hines*) (granting immediate release from custody).[15]

48. Petitioner requested RDAP in writing ca. August 2021. BOP agents Mr. Todd Royer and Ms. Rebekka Eisele soon told Petitioner he was a minimum-security prisoner and they were putting him in for "step down," i.e. transfer out of the CMU program.

49. Petitioner reasonably interpreted Royer's and Eisele's statement to mean he was going to RDAP. *See* Male Custody Classification Form, Aug. 11, 2021 ("SCORED LEV MINIMUM"), Exh. 2.

50. In November 2021 Respondent confirmed Petitioner was placed on the RDAP-interview list. But Respondent also told Petitioner he would have to leave his administrative placement in the communications-management unit (CMU) to attend RDAP.

51. Having never requested placement in the CMU and having been told by Royer and Eisele that they had filed for Petitioner's transfer out of the CMU program, Petitioner reasonably saw no

[15] Petitioner recognizes but views as inapposite *Bush v. Pitzer*, 133 F.3d 455, 458–59 (7th Cir. 1997) ("a prisoner whose *offense* was 'nonviolent' is eligible in the same sense that the Bureau *could* release him early, but the Bureau need not extend the program to the maximum extent the statute permits") (emphasis in original). The events in *Bush* preceded Respondent's statutory obligation to extend RDAP to "all eligible prisoners" under § 3621(e)(1)(C) and adoption of the relevant policies widely entitling prisoners today to RDAP sentence reductions, as well as RDAP's designation as an FSA EBRR available to all prisoners under § 3621(h)(2)(A). *See, again*, EBRR & PA List at 1, ninth row ("Residential Drug Abuse Treatment Program (RDAP)"), *presum.* dkt. 1-4 at 2. And Petitioner's Section-3621(e) eligibility, unlike Bush's, has been conceded and cannot be seriously disputed. No "sensible grounds," *Bush* at 458, exists to exclude Petitioner, a minimum-security prisoner, from RDAP, which is available even to high-security penitentiary prisoners. Congress, moreover, expected the BOP to make RDAP early-release determinations "based on criteria to be established and uniformly applied." H.R. Rep. No. 103-320 (1993). No such criteria excluding Petitioner were formally established and certainly excluding one individual, Petitioner, placed under communications management for his publication of unflattering but true news articles about the Justice Department, cannot reasonably be construed as uniform application. Bush also brought no due-process challenge, 133 F.3d at 456, but Petitioner does so, *infra*, ¶¶ 74–83.

need to take further action.

52.  But on January 21, 2022, Respondent transferred Petitioner not to RDAP, but to another CMU in Marion, IL.

53.  Immediately upon arrival at United States Penitentiary (U.S.P.) Marion, Petitioner again requested RDAP from the BOP, both orally and in writing.

54.  In answer to Petitioner's requests, BOP Psychologist Dr. Fields, Psy.D., J.D. placed Petitioner on the RDAP-interview list.

55.  On April 20, 2022, Public Health Service Psychologist Dr. C. Gauthier, Psy.D., interviewed Petitioner and found him eligible for RDAP. *See, supra,* ¶ 40 (citing BOP documents).

56.  No subsequent evaluation has been performed.

57.  Shortly after the interview the BOP's Designation and Sentence Computation Center (DSCC) determined that Petitioner is eligible for the RDAP sentence reduction under § 3621(e)(2)(B). *See, supra,* ¶ 41 (citing BOP documents).

58.  On April 27, 2022, Petitioner filed a Standard Form 95 claiming damages for Respondent's denial of Petitioner's RDAP placement without due process, *presum.* dkt. 1-7. *But, see, again, supra,* ¶ 8/(Petitioner disavows any construal of *this case* as one seeking damages).

59.  Respondent's North Central Regional Office later acknowledged Petitioner's Standard Form 95 as received more than a full month later, on June 2, 2022. Notice of Receipt of Administrative Claim TRT-NCR-2022-05171, *presum.* dkt. 1-7 at 10—11. Respondent noted a response was due Dec. 1, 2022. *Id.*

60.  No response whatsoever has been forthcoming.

61.  The day after Petitioner mailed his Form 95 he began his informal resolution.   *See* Administrative Remedy—Informal Resolution ("BP-8") as Subm. Apr. 28, 2022, *presum.* dkt. 1-8.

62.  BOP staffers in Marion assured Petitioner his RDAP matter was being attended-to.  Informal resolution then lingered for nearly six months until Oct. 12, 2022.[16]

63.  In the interim, Respondent placed Petitioner at no. 36 on the waiting list for RDAP at

---

[16] Petitioner notes there is no time limit for informal resolution. *Cf.*, *e.g.*, 28 C.F.R. § 542.18 (establishing time limits for all other remedy stages, but not establishing any time limit for informal resolution).

U.S.P. Marion. *See* Dr. A. Fields, J.D., Psy.D., Chief Psychologist, DAP QUAL Inmates at USP Marion, Apr. 22, 2022, Exh. 3.

64. BOP records will show that while Petitioner awaited indeterminate informal resolution of his request for RDAP, the BOP inducted many prisoners whose numbers appeared lower on the DAP QUAL list than Petitioner's. In effect, Petitioner was skipped-over for RDAP at U.S.P. Marion.

65. As soon as Petitioner could do so, he timely filed a formal remedy request at U.S.P. Marion seeking RDAP. *See* Marion RDAP BP-9 as Subm. Oct. 14, 2022, *presum.* dkt. 1-9.

66. Twenty-seven days later, on Nov. 10, 2022, i.e. before the BP-9-answer deadline, the U.S.P. Marion warden transferred Petitioner back to the CMU in Terre Haute.

67. Petitioner's BP-9 for RDAP filed at U.S.P. Marion has never been answered.

68. As soon as practicable upon Petitioner's return to Terre Haute he again attempted informal resolution for RDAP. *See* Terre Haute RDAP BP-8 (signed Nov. 10, 2022; marked received by Eisele Nov. 14, 2022), *presum.* dkt. 1-10.

69. Petitioner was told he could not attend RDAP due to his CMU placement. *Id.* at 2 (Response of M. Myers).

70. Petitioner again timely filed a formal remedy request for RDAP. *See* Terre Haute RDAP BP-9 as Subm. Nov. 22, 2022, *presum.* dkt. 1-11.

71. Petitioner also timely filed a central-office remedy appeal ("BP-11"). *See* Terre Haute RDAP BP-11 as Subm. Nov. 22, 2022, *presum.* dkt. 1-12 (quoting 28 C.F.R. § 542.14(d)(5) ("formal administrative remedy requests regarding initial decisions that did not originate with the Warden[*sic*], or his/her staff, may be initially filed with the Bureau office which made the original decision"); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5214.02 Communications Management Unit (Apr. 1, 2015) ("CMU P.S.") at ch. 3(e) ("Only the Assistant Director (or Acting Assistant Director), Correctional Programs Division, has the authority to designate an inmate to a CMU")).

72. Petitioner's Terre Haute RDAP BP-9 and -11 remain unanswered.

73. The relevant statute, under which Petitioner is entitled to RDAP and to credit toward his sentence, 18 U.S.C. § 3621(e)(1)(C), (2)(B), (h)(2)(A), admits of no exception for CMU prison-

ers.

74. Once again, Petitioner "has a protected liberty interest in his good-time credits and credit-earning class, and he may not be deprived of either without the minimum requirements of due process." *Calligan*, 362 F. App'x at 545 (citing *Piggie*, 277 F.3d at 924).

75. No hearing was ever conducted either to place Petitioner in a CMU or deprive him of the opportunity to earn credit toward his sentence for RDAP.

76. The closest thing to such a hearing occurred ca. August 2021, *supra*, ¶¶ 48–49, and the decisionmakers agreed with Petitioner and recommended his "step down" from the CMU.

77. Petitioner was never given any written denial of his "step down." *Cf. Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007) (requiring a written statement by the factfinder to satisfy due-process requirements).

78. In contrast, every written determination supports Petitioner's RDAP eligibility and his eligibility for the corresponding sentence reduction.

79. And Petitioner has never once been heard by the actual decisionmaker as to his continued CMU placement and deprivation of RDAP. *See Aref v. Lynch*, 833 F.3d 242, 257–58 (D.C. Cir. 2016) (CMU placement is an atypical and significant prison hardship requiring procedural due process); *cf. Hunt v. Fairman*, 1998 U.S. Dist. LEXIS 2378, No. 94 C 7321 (N.D. Ill. Feb. 24, 1998) at *12–13 (finding "a reasonable person could conclude that the final decision [...] was not fairly made" where, *inter alia*, the adversely affected person "did not receive an opportunity to tell his side of the story to the ultimate decision-maker").

80. Moreover, Respondent's own policy states: "A CMU is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU." CMU P.S. at ch. 1 (quoting 28 C.F.R. § 540.100(b)).

81. Thus Respondent's own policy cannot be said to support depriving Petitioner of the opportunity to earn RDAP credit due to his CMU placement.

82. Instead, that same policy insists: "CMU designation is non-punitive." *Id.*

83. But requiring Petitioner to spend an entire year longer in prison than similarly situat-

ed persons outside the CMU is quintessentially punitive.

## VI.  Respondent must abide by the First Step Act of 2018.

84.  Petitioner has little visibility into Respondent's FSA time-credit calculations, and the BOP has kept its methodology in flux since the FSA's enactment.

85.  On Oct. 27, 2022, Petitioner was given his very first paperwork purporting to show his FSA time credits.

86.  That first report credited Petitioner with 244 days of FSA time credit and said his halfway-house-slash-home-confinement eligibility date was in October 2023.

87.  Petitioner forthwith went to work to confirm or refute the calculation.

88.  But before he could look-up all the relevant documents and apply them to his particular situation, Petitioner was told to "pack-out" his property, including his paper records, on Nov. 7, 2022.

89.  Petitioner was then transferred back to FCI Terre Haute on Nov. 10, 2022.

90.  Petitioner was thereafter kept in quarantine or administrative detention—with neither an administrative-detention hearing nor order—until Nov. 17, 2022.

91.  Upon Petitioner's release to general population he completed an initial set of calculations and discovered a 54-day-credit discrepency.

92.  Petitioner attempted informal resolution at FCI Terre Haute.  *See* FSA-credit BP-8 as Subm. Nov. 28, 2022, *presum.* dkt. 1-13.  Petitioner has been given no response.

93.  Upon Petitioner's completion of his first comprehensive calculation, he mailed a relevant BP-9 and two relevant regional administrative-remedy appeals ("BP-10s").  *See* FSA-credit BP-9 & BP-10s as Subm. Nov. 30, 2022, *presum.* dkt. 1-14.

94.  Three weeks later Petitioner received the Designation and Sentence Computation Center (DSCC)'s rejection of one of those remedies.  *See* FSA-credit BP-9 as Rej. Dec. 21, 2022, Exh. 4.

95.  Petitioner has received no answers to the other FSA-credit remedies.

96.  Petitioner forthwith appealed the rejection of FSA-credit BP-9.  *See* FSA-credit BP-11 as Subm. Dec. 21, 2022, Exh. 5.

97.  Before Petitioner opened this case he searched for U.S. court precedents holding that

Section-2241 relief is or is not available for FSA-credit calculation but found none.

98. Petitioner notes, generally, "[Section] 2241 is used for [...] challenges to the fact or duration of confinement." *Supra*, ¶ 7 (quoting *Walker*, 216 F.3d at 629).

99. As for Respondent's discretion to apply FSA credit "toward time in prerelease custody or supervised release," 18 U.S.C. § 3632(d)(4)(C), Petitioner notes that either would be "a quantum change" in his "level of custody" and "habeas corpus is his remedy." *Graham, supra*, 922 F.2d at 381.

## VII.  Respondent must return Petitioner's GCT for the Court-access IR 3338082.

100. Though the merits remain ripe and unadjudicated, Court-access IR 3338082 was already the subject of comprehensive briefings before this Court. *See, generally, Lammer, supra*, ¶ 11.[17]

101. Petitioner herein incorporates by reference his relevant, yet-to-be-considered *Lammer* filings, *e.g.*

- Petition, dkt. 1;
- Declaration of Martin Gottesfeld re *Exhaustion, Retaliation & Justiciability* (ERJ Decl.), dkt. 100;
- Amended Reply in Support of Petition, dkt. 101;
- Motion to Supplement or Amend, dkt. 102;
- Rule 59(e) Motion, dkt. 106; and
- Reply in Support of Rule 59(e) Motion, dkt. 109.

102. Should, for example, Respondent contest exhaustion as to any of Petitioner's claims, Petitioner requests limited discovery and a hearing. *See* Amended Reply in Support of Petition at § 5 Criteria for Petitioner to Conduct Discovery (citing, *inter alia, Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)), *Lammer*, dkt. 101 at 5.

103. As specifically to Court-access IR 3338082, Petitioner had already exhausted on the persistent suppression of his access to the courts. *Id.* at 6, § 6 Petitioner Exhausted Even Though Exhaustion Is Inapplicable (citing, *inter alia, Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("In order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable

---

[17] The Court dismissed *Lammer* "without prejudice." Final Judgment, *Lammer*, dkt. 98 (July 18, 2022). In so doing the Court, on procedural grounds inapplicable to the case at bar, declined to consider Petitioner's arguments on exhaustion and retaliation. *See* Order Denying Rule 59(e) Motion, *Lammer*, dkt. 111 (Oct. 28, 2022).

condition is continuing"); Court-access BP-11 Cent. Office's Resp. ("You state you have the right to access the Courts without interference or delay"), *Lammer*, dkt. 100-58 at 2).

104. More generally, "Petitioner had already exhausted on due-process grounds" of vagueness of BOP prohibited-act code 204 as applied in Court-access IR 3338082. *See* Amended Reply in Support of Petition at 8—10, *Lammer*, dkt. 101.

105. Petitioner had also exhausted as to Respondent's retaliation against Petitioner's protected conduct. *See id.* at 10—11 (citing, *inter alia*, Petition at ¶¶ 124—25 (Petitioner "timely filed another BP-8," i.e. the Eisele BP-8, "in which he noted that agents of [R]espondent were retaliating against [P]etitioner's Constitutionally-protected petitions to the government for the redress of grievances," but he received no response), *Lammer*, dkt. 1 at 24); *Barnett v. Harlow*, 2019 U.S. Dist. LEXIS 94080, No. 2:18-cv-397-JMS-MJD (S.D. Ind. June 5, 2019) at *7 (BP-8s are "not recorded in [the BOP's] SENTRY database"); *Turley* at 650 n. 3 ("[W]hen the prisoner follows procedure but receives no response due to error by the prison, this court has found that the prisoner exhausted"); ERJ Decl. ¶¶ 177, 221, 243, 255, 266—68, 271—72, 307 (appeals of unanswered BP-8 for copy of withheld DHO report were rejected at all remedy levels), *Lammer*, dkt. 100; *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (this circuit does not permit prison officials "to exploit the exhaustion requirement through indefinite delay in responding to grievances") (internal quotation marks and citation omitted).

106. Further, Respondent is estopped from raising exhaustion. *See* Amended Reply in Support of Petition at § 7, *Lammer*, dkt. 101 at 11—12.

107. Petitioner also   expressly notes: "The fact that [Prisoner] was able to file his FTCA claim and [a] lawsuit does not prove that remedies were available within the [prison] system." Rule 59(e) Motion at § 3, *Lammer*, dkt. 106 at 4 (quoting *Kaba v. Stepp*, 458 F.3d 678, 686 (7th Cir. 2006) (first and third alterations in Motion, second alteration applied here)). "Threats or other intimidation by prison officials may well deter a prisoner of ordinary firmness from filing an internal grievance, but not an external one because the latter might avoid threatened retaliatory conduct from prison employees." *Id.* (quoting *Kaba* at 686 (internal quotation and alteration marks and citations omitted)).

108. Moreover, exhaustion is inapplicable to the Court-access IR for four distinct reasons. *See* Amended Reply in Support of Petition at § 8, *Lanmer*, dkt. 101 at 12—17 (citing, *inter alia*, *Iddir v. INS*, 301 F.3d 492, 498 (7th Cir. 2022)).

109. First, Court-access IR 3338082 raised a substantial constitutional question "when BOP— a U.S. agency—in response to Petitioner's exhaustion, deprived him of earned GCT, subjected him to atypical and significant hardships, fined him and destroyed his property, based on a vague regulatory promulgation, thus depriving him of his expressly protected rights to petition and due process." *See* Amended Reply in Support of Petition at § 8(a), *Lanmer*, dkt. 101 at 13 (internal quotation and alteration marks and citations omitted).

110. Second, further exhaustion meant unreasonable, indefinite and prejudicial delay, *e.g.*, allowing Respondent to spoliate essential evidence absent this Court's order to preserve it. *Id.* at § 8(b) (citing ERJ Decl. ¶¶ 304—06, *Lanmer*, dkt. 100 at 41 (Respondent refused to preserve evidence absent this Court's Order, *Lanmer*, dkt. 9)).

111. Third, the "BOP expressly disavows administrative review of DHO findings for statutory or constitutional violations." *Id.* at § 8(c) (citing, *inter alia*, U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5270.09 Inmate Discipline Program (July 8, 2011) ("Disc. P.S.") at ch. 5 ("The decision of the DHO is final and subject to review only by the Regional Director to ensure conformity with the disciplinary policy"; "On appeals, the reviewing authority considers: Whether the UDC or DHO substantially complied with regulations on inmate discipline")).

112. And, fourth, the BOP is biased and predetermined the outcome of the DHO proceeding. *See id.* at § 8(d) (the BOP gave itself a fifty-dollar pecuniary interest in the matter and enjoys protection from suit under *Edwards v. Balisok*, 528 U.S. 641, 645—46 (1997)).

113. The challenged discipline—overtly imposed against Petitioner's unambiguous statutory exhaustion before filing in court—was clearly unconstitutional. *See id.* at §§ 9, 9(a) (providing authorities holding that retaliatory discipline invalidates prison administrative proceedings, prisoners may not be disciplined in any way for making reasonable attempts to petition the courts and vague restraints on protected conduct are unenforceable, and noting the total lack of admissible evidence as to Eisele's state of mind and requesting leave to propound interrogatories).

114. The challenged disciplinarian was also biased and without credibility. *See id.* at §
9(b) (noting that alternate DHO D. Matthews was Complainant Eisele's fellow case manager and that
Matthews nowhere denied his bias, established his neutrality or denied that he had predetermined
the outcome of the disciplinary hearing).

115. Petitioner was also denied exculpatory documentary and testimonial evidence. *See id.* at
§ 9(c) (noting Petitioner requested and the DHO withheld without explanation relevant audio and
video footage and legal documents, preventing Petitioner from completing a written statement).

116. After the relevant events detailed in the incorporated *Lanmer* filings, Petitioner re-
ceived a second rejection of remedy 1120431 seeking the IR's expungement. *See* Matthews BP-10 Re
Court-access IR 3338082 II As Rej., Aug. 9, 2022, *presum.* dkt. 1-15.

117. Respondent took 12 days to deliver the remedy to the regional office after Petitioner
prepared it on June 15, 2022. *See* Matthews BP-10 Re Court-access IR 3338082 II Rej. Ntc. ("DATE
RECEIVED: JUNE 27, 2022"), *presum.* dkt. 1-15 at 2.

118. Regional then took three days to reject it. *Id.* ("DATE: JUNE 30, 2022").

119. A further 27 days then passed before the rejection notice was marked received back in
Marion. *Id.* ("RECEIVED JUL 27 2022 M").

120. Another 12 days passed before Marion then placed the rejection "in the inmate mailbox
back to" Petitioner. *See* Matthews BP-10 Re Court-access IR 3338082 II Timel. Memo. ("August 8,
2022"), *presum.* dkt. 1-15 at 1.

121. Petitioner ultimately received the rejection the following day, a round-trip time of 55
days.

122. Regional again rejected the remedy based upon an unwritten rule nowhere in remedy poli-
cy or regulation: "YOU DID NOT PROVIDE A COPY OF THE DHO REPORT YOU WISH TO APPEAL OR IDENTIFY THE
CHARGES AND DATE OF THE DHO ACTION." Matthews BP-10 Re Court-access IR 3338082 II Rej. Ntc., *pre-
sum.* dkt. 1-15 at 2.

123. Regional claimed this rejection reason despite Petitioner's clearly stating the charges
and date of the DHO action. *See* Matthews BP-10 Re Court-access IR 3338082 II Form As Ret. ("DHO
action taken 12-20-2019, charge 204A attempted extortion"), *presum.* dkt. 1-15 at 3.

124. Left to experiment, Petitioner retrieved from his records a copy of the DHO report and filed another regional remedy appeal with the DHO report, instead of, as regional had expressly told Petitioner would suffice, merely specifying the charge and date of the DHO action. *See* Matthews BP-10 Re Court-access IR 3338082 III As Subm., Aug. 9, 2022, *presum.* dkt. 1-16.

125. More than a month later Petitioner received a third rejection. *See* Matthews BP-10 Re Court-access IR 3338082 III As Rej., Sept. 27, 2022, *presum.* dkt. 1-17.

126. Respondent took eight days to deliver the remedy appeal to regional. *See* Matthews BP-10 Re Court-access IR 3338082 III Rej. Ntc. ("DATE RECEIVED: AUGUST 17, 2022), *presum.* dkt. 1-17 at 1.

127. Regional then took 23 days to reject it. *Id.* ("DATE: SEPTEMBER 9, 2022").

128. Another 11 days passed before the remedy appeal arrived back at Marion. *Id.* ("RECEIVED SEP 20 2022 MW").

129. A full week then passed before Petitioner received the rejection. *Id.* ("Recv'd 9-27-22 N[athan ]S[impkins]").

130. The total round-trip the third time took 49 days.

131. The stated reason for the rejection was: "YOUR APPEAL IS UNTIMELY." *Id.* at REJECT REASON 1.

132. Regional did not address Petitioner's citation: "I note 28 C.F.R. [§] 115.52(b)(1) ('The agency shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse')." Matthews BP-10 Re Court-access IR 3338082 III Form As Ret., *presum.* dkt. 1-17 at 2.

133. Petitioner timely appealed the rejection. *See* Matthews BP-11 Re Court-access IR 3338082 As Subm., Sept. 30, 2022 (citing 28 C.F.R. §§ 542.17(b), (c) (inmate may appeal a rejection if not allowed to resubmit to the same remedy level), 115.52(b)(1) (no time limit on PREA-related remedies), 115.67(c) (BOP must act promptly to remedy retaliation against PREA reporting)), *presum.* dkt. 1-18.

134. Sixty-three days later, having received no response, Petitioner wrote to his former case manager to confirm the remedy had in fact been mailed. *See* Inmate Request to Staff to Nathan Simpkins Re Remedies, Dec. 2, 2022, *presum.* dkt. 1-19.

135. "Petitioner executed Petition Mon., Dec. 5, 2022." Suppl. Pet. at ¶ 87, dkt. 5-1 at 1 (citing Petition at § X ("Executed Mon., Dec. 5, 2022"), dkt. 1 at 21).

136. "Petitioner at his next opportunity thereafter, on Tue., Dec. 6, 2022, turned over care, custody and control of Petition to agent of Respondent Ms. Jamie Wheeler for mailing to the Court." *Id.* at ¶ 88.

137. At noon that same day Petitioner had a 15-minute monitored call with his wife Mrs. Dana Gottesfeld. *See* CMU P.S. at ch. 5(c)(2) (quoting 28 C.F.R. § 540.204(b) (*"Unmonitored telephone communication* is limited to privileged communication with the inmate's attorney") (emphasis in original)).

138. On that call Petitioner learned no later than Respondent that NBCUniversal had publicly announced its four-part documentary series on Petitioner's Crim. Case.[18]

139. The next day:

> agent of Respondent Case Manager Ms. Rebekka Eisele gave Petitioner an unsigned answer to his Dec. 2, 2022, request to CMU Marion Case Manager Mr. Nathan Simpkins: "The memo for remedy 1120386," i.e. for the TAC IR 3552752, "was written and sent out on 11-8 and the one for remedy 1120431," i.e. for the Court-access IR 3338082, "was written and sent on 10-5."

Suppl. Pet. at ¶ 89 (quoting Inmate Request to Staff to Nathan Simpkins Re Remedies As Ans., Dec. 7, 2022, Exh. 25 to Suppl. Pet., dkt. 5-1).

140. "Petitioner asked Eisele to confirm that the unsigned response came verbatim from Simpkins and Eisele confirmed that it had in fact come from Simpkins." *Id.* at ¶ 90.

141. "Also on Wed., Dec. 7, 2022, Petitioner confirmed with Wheeler, directly under a camera and microphone, just outside the FCI Terre Haute D-unit law library, that the Petition had, in Wheeler's words: 'went out yesterday.'" *Id.* at ¶ 92 (citing Inmate Request to Staff Re Preservation of Audio and Video, Exh. 26 to Suppl. Pet., dkt. 5-1).

142. "That Petition had 'went out yesterday,' as Wheeler confirmed, meant that Respondent had read Petition for contents on Tue., Dec. 6, 2022." *Id.* at ¶ 93 (citing CMU P.S. at ch. 5(c)(1) ("Incoming and outgoing written general correspondence is ordinarily reviewed by CTU staff

---

[18] *See* NBCUniversal, *Trailer for THE BATTLE FOR JUSTINA PELLETIER: Who do you believe?* (Dec. 6, 2022), available at https://youtu.be/11aM72CoOoM (one, lima, alpha, capital Mike, seven, two, capital Charlie, oscar, zero, oscar, capital Mike).

before delivery to the inmate or further processing to the post office") (citing 28 C.F.R. §
540.203 (mail to U.S. courts and judges is treated as general correspondence and read for con-
tents))). *See also, supra,* ¶ 11 (all mail thoroughly reviewed) (citing remedy response).

143.   At 5:40 P.M. Dec. 9, 2022, Petitioner had another call with his wife which Respondent
monitored in real time. *Cf., supra,* ¶ 137 (citing CMU P.S. at ch. 5(c)(2) (unmonitored telephone
calls are limited to attorneys)).

144.   Petitioner and his wife began discussing attorneys and Respondent cut the call.

145.   Petitioner then executed Suppl. Pet., dkt. 5-1 and "turned over care, custody and con-
trol thereof to Respondent on Mon., Dec. 12, 2022, for mailing to the Court USPS Priority Mail
bearing U.S.P.S. tracking no. 9114 9022 0078 9988 6602 90." Sec. Suppl. Pet. at ¶ 119 (citing
Suppl. Pet. at 9, dkt. 5-1).

146.   Therein Respondent read Petitioner tell the Court: "the Court-access IR 3338082 [staff
memo.] 'was written and sent on 10-5.'" Supp. Pet. at ¶ 89, dkt. 5-1 at 1 (quoting Inmate Request
to Staff to Nathan Simpkins Re Remedies As Ans., Dec. 7, 2022, Exh. 25 to Suppl. Pet., dkt. 5-1).
*See also* Petition at ¶¶ 66—67, dkt. 1 at 17 (Petitioner had received no response to the Matthews
BP-11 Re Court-access IR 3338082 after 66 days); *supra,* ¶ 142 (Respondent reads Petitioner's court
mail as general correspondence) (citations omitted).

147.   At noon Dec. 13, 2022, Petitioner had a call with his wife which Respondent again moni-
tored in real time. *Cf., supra,* ¶¶ 137, 143—44 (Respondent live monitors and intercedes in Peti-
tioner's calls with Mrs. Gottesfeld) (citations omitted).

148.   Via that call Petitioner learned no later than Respondent did that NBCUniversal had
earlier that day released its four-part docuseries on Petitioner's Crim. Case.[19]

149.   Knowing that Respondent read Suppl. Pet., and its section about the unanswered Matthews
BP-11 Re Court-access IR 3338082, *supra,* ¶ 146 (citations omitted), Petitioner was less than sur-
prised shortly thereafter when Eisele belatedly handed him the corresponding remedy rejection.
*See* Matthews BP-11 Re Court-access IR 3338082 As Rej., Dec. 14, 2022, Exh. 30 at 6 to Sec. Suppl.

---

[19] *See, e.g.,* The Battle for Justina Pelletier, Episode 1, "Our Little Peanut," NBCUniversal (Dec.
13, 2022), available at https://www.peacocktv.com/watch-online/tv/the-battle-for-justina-
pelletier/5657866397468499112/seasons/1/episodes/our-little-peanut-episode-1/1b3adf03-621f-3721-
b8d8-f5ed750da211

Pet., dkt. 7-1.

150. "Twenty-five days passed between Petitioner's execution of the relevant BP-11 and Respondent's central office stamping it 'RECEIVED OCT 25 2022.'" Sec. Suppl. Pet. at 3, ¶ 131 (quoting Matthews BP-11 Re Court-access IR 3338082 Form As Ret., Exh. 30 at 8 to Sec. Suppl. Pet.).

151. "A further 23 days elapsed before the central office decided to reject the remedy." Id. (citing Matthews BP-11 Re Court-access IR 3338082 Rej. Ntc., Nov. 17, 2022, Exh. 30 at 7 to Sec. Suppl. Pet., dkt. 7-1).

152. "A further 27 days elapsed before Respondent delivered the rejection to Petitioner." Id. (citing Matthews BP-11 Re Court-access IR 3338082 Rct. of Adm. Rem., Dec. 14, 2022, Exh. 30 at 6 to Sec. Suppl. Pet., dkt. 7-1).

153. "In total 50 days elapsed between the rejection and its delivery to Petitioner, and the round-trip time for the BP-11 itself was 75 days." Id. at 4, ¶ 132.

154. "This time the central office told Petitioner: 'STAFF MEMO, IF DEEMED APPROPRIATE, MUST JUSTIFY TWO-YEAR DELAY IN FILING. OTHERWISE, YOUR APPEAL IS UNTIMELY.'" Id. at ¶ 133 (quoting Matthews BP-11 Re Court-access IR 3338082 Rej. Ntc. at REMARKS, Exh. 30 at 7 to Sec. Suppl. Pet.).

155. "But Petitioner had asserted that regional's 'rejection solely on untimeliness[...] violates the Prison Rape Elimination Act.'" Id. at ¶ 134 (quoting Matthews BP-11 Re Court-access IR 3338082 Form As Ret, Exh. 30 at 8 to Sec. Suppl. Pet. (quoting 28 C.F.R. §§ 115.52(b)(1) ("The agency shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse"), 115.67(c) (BOP "shall act promptly to remedy" PREA retaliation, including IRs))).

156. "None of the relevant federal regulations or U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statements state that any such 'STAFF MEMO' is required." Id. at ¶ 135 (quoting Matthews BP-11 Re Court-access IR 3338082 Rej. Ntc., Exh. 30 at 7 to Sec. Suppl. Pet.) (citing, in toto, U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 1330.18 Administrative Remedy Program (Jan. 6, 2014) ("ARP P.S.") (quoting 28 C.F.R. §§ 542.10 et seq.); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) ("PREA P.S.") (quoting 28 C.F.R. §§ 115.5 et seq.); Disc. P.S.

(quoting 28 C.F.R. §§ 541.1 *et seq.*)).

157.   "Thus the administrative rulebook cannot be said to require a 'STAFF MEMO[.]' for a prisoner to assert that the BOP 'shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse.'" *Id.* at ¶ 136 (quoting Matthews BP-11 Re Court-access IR 3338082 Rej. Ntc., Exh. 30 at 7 to Sec. Suppl. Pet. (alteration in Sec. Suppl. Pet. ¶ 136); PREA P.S. (quoting 28 C.F.R. § 115.52(b)(1)).

158.   "And when a grievance meets all of the Administrative Code's written requirements, it cannot be dismissed because of a requirement on which the administrative rulebook is silent." *Id.* at ¶ 137 (citing *Dole v. Chandler*, 438 F.3d 804, 810 (7th Cir. 2006) (citing *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)); Amended Reply In Support of Petition at 12, *Lammer*, dkt. 101 (noting the same holding in regards to other remedies illegitimately rejected by Respondent)).

159.   "Petitioner hereby asserts"—and to be clear Petitioner incorporates this same assertion into this Amended Petition—"that the rejections of Matthews BP-10 Re Court-access IR 3338082 III and Matthews BP-11 Re Court-access IR 3338082 are illegitimate and that the remedy process is exhausted." *Id.* at 5, ¶ 138.

160.   At 6:00 P.M. the day after the rejection, Dec. 15, 2022, Petitioner had another call with his wife. *See, supra,* ¶¶ 137, 143—44, 147—48 (Respondent live monitors and intercedes in Petitioner's calls with Mrs. Gottesfeld) (citations omitted).

161.   Again the call turned to the subject of lawyers and again Respondent cut the call.

162.   "Petitioner is risk-adverse to potential forfeiture of his rights." Sec. Suppl. Pet. at 5, ¶ 139. So, although "Petitioner continues to assert remedies were never available for the Court-access IR 3338082—and he believes he has more than adequately proved this point"—he has, out "of an abundance of caution," as well as to buttress his argument further, "timely followed-up." *Id.* at 3, ¶ 129 (citing Matthews BP-10 Re Court-access IR 3338082 IV Deduplicated (Dedupl.), Dec. 16, 2022, Exh. 30 to Sec. Suppl. Pet., dkt. 7-1).

163.   The same day Petitioner prepared his resubmission of the relevant remedy, he also prepared a written request to his Terre Haute case manager for the timeliness memo. that the central office had instructed him to obtain, *supra,* ¶ 154 (citation omitted). *See* Inmate Request to Staff

to Case Manager Re Timeliness Memo. for Remedy No. 1120431, Dec. 16, 2022. ("Req. for Memo."), Exh. 31 to Sec. Suppl. Pet, dkt. 7-1.

164.   As Petitioner later noted, the staff memo. that the central office told him to obtain to appeal the Court-access IR 3338082 is certainly adverse to Case Manager Eisele and other Terre Haute BOP staffers because of some of the facts that it must verify to "JUSTIFY" his waiting until he had left Terre Haute to file remedies.

165.   "Ca. June 27, 2019, I sent a CORRLINKS message accusing [Unit Manager] Mr. Todd Royer of sexual abuse under the Prison Rape Elimination Act (PREA), i.e. sexual voyeurism, quoting 28 C.F.R. § 115.6." Req. for Memo. at ¶ 2 (alteration added).

166.   "Ca. June 28, 2019, I tried to mail a PREA complaint against Royer to the U.S. Dep't of Justice Office of the Inspector General (OIG). Case Manager Ms. Rebekka Eisele returned the mailing to me the next business day, which I had not been allowed to seal, and she refused to mail it. Eisele did not separate Royer from me." Id. at ¶ 3 (citing cf. PREA P.S. (quoting 28 C.F.R. § 115.64(a)(1) (responding security staff must "Separate alleged victim and abuser")) ("In the Bureau, all institution staff are considered to be 'security staff'")).

167.   "Ca. June 28, 2019, FCI Terre Haute [Special Investigative Services] Lt. Mr. Jamie Baker came to the CMU to interview me about the alleged PREA violation, which had been recorded on closed-circuit audio and video that was immediately available for his review. Lt. Baker did not separate Royer from me." Id. at ¶ 4 (alteration added) (citing same).

168.   "Ca. July 1, 2019, I mailed a declaration to court accusing Royer of sexual abuse under PREA, i.e. sexual voyeurism." Id. at ¶ 5 (citing Affidavit of Martin Gottesfeld, Hurwitz, supra, dkt. 63 at 5–8 (quoting 28 C.F.R. § 115.6)). "I later gave a copy of this declaration to FCI Terre Haute [Special Investigative Services] Lt. Mr. J. Sherman. Sherman did not separate Royer from me." Id. (alteration added).

169.   "Ca. Nov. 26, 2019, I turned in to Eisele an Administrative Remedy—Informal Resolution ('BP-8'), stating, inter alia

My prior attempt to anonymously report a PREA violation by Todd Royer to the OIG led directly to internal [Special Investigative Services] Lt. [Mr. Jamie] Baker['s] trying to interview me in the CMU and this was wholly inappropriate[...] Please fix the current

noncompliance with 28 C.F.R. § 115.51(b) in the FCI[ Terre Haute] CMU by providing anony-
mous access to an external PREA hotline or other entity outside the DOJ, and please fix
TRULINCS so that the 'Request to Staff' button is no longer disabled in the CMU.

*Id.* at ¶ 6 (first and last alterations added, others in Req. for Memo.).

170. "Eisele *et al.* never answered this BP-8." *Id.*

171. "The morning of Mon., Dec. 9, 2019, I handed Eisele remedy no. 1000236-F1, stating, *in-
ter alia,* 'My prior attempt to report anonymously a PREA violation by Todd Royer to the OIG led
directly to internal [Special Investigative Services] Lt. [Mr. Jamie] Baker['s] trying to inter-
view me in the CMU and this was wholly inappropriate' and 'Please fix the current noncompliance
with 28 C.F.R. § 115.51(b) in the FCI[ Terre Haute] CMU by providing anonymous access to an exter-
nal PREA hotline or other entity outside the DOJ, and please fix TRULINCS so that the "Request to
Staff" button is no longer disabled in the CMU.'" *Id.* at ¶ 7 (first and last alterations added,
others in Req. for Memo.).

172. "Later on Dec. 9, 2019, Eisele filed incident report (IR) 3338082 against me, charging
me with attempted extortion based on a court-related request I had given to her more than 48 hours
earlier on Fri., Dec. 6, 2019. More than 24 hours had elapsed between my handing Eisele the re-
quest in question in the IR and my handing Eisele remedy no. 1000236-F1, and in that time Eisele
did not file IR 3338082; she filed IR 3338082 only after I handed her remedy no. 1000236-F1." *Id.*
at ¶ 8 (citing Req. for Memo. at ¶ 7; *cf.* Disc. P.S. at ch. 2 (quoting 28 C.F.R. § 541.5 ("You
will ordinarily receive the incident report within 24 hours of staff becoming aware of your in-
volvement in the incident"))).

173. "FCI Terre Haute Lt. Mr. B. Devlin delivered the IR and placed me in the SHU. I told
Devlin immediately upon receipt of the IR that it was retaliatory. At no point did any FCI Terre
Haute staffer ever separate me from Royer." *Id.* at ¶ 9.

174. "On Dec. 20, 2019, IR 3338082 was decided by Mr. D. Matthews. Matthews and Complainant
Eisele were both case managers at FCI Terre Haute and Matthews and Royer were both alternate dis-
ciplinary-hearing officers (DHOs) at FCI Terre Haute." *Id.* at ¶ 10 (citing *Malone v. United
States AG,* 858 F. App'x 296, 297 (11th Cir. 2021) ("[S]ome facilities also employ alternate DHOs
who assist with the disciplinary case load as a 'collateral duty,' meaning that alternate DHOs

continue to fulfill their primary job[s]")).

175. "Either while rem. no. 1000236-F1 was assigned to my then-unit manager Ms. D[enise] Thomas for investigation, or very shortly thereafter, Warden Brian Lammer made Royer my new unit manager." *Id.* at ¶ 11.

176. "Royer remained my unit manager until my transfer to U.S.P. Marion on Jan. 21, 2022." *Id.* at ¶ 12.

177. Drafting Matthews BP-10 Re Court-access IR 3338082 IV and Req. for Memo. took Petitioner many hours, until long past unit mail call on Fri., Dec. 16, 2022. Petitioner thus had to wait at least until the next business day for an opportunity to submit them to his unit team.

178. After Jewish Shabbat (Sabbath) ended the next night, Petitioner addressed Respondent's interference with his phone calls to his wife in an electronic message to journalists, attorneys, friends and family members. *See* Martin Gottesfeld, *I Face Continued, Illegal Justice Department Revenge For Pursuing My Case and Other Protected Conduct, Says MartyG* (Dec. 17, 2022), Exh. 6.

179. Therein Petitioner quoted Respondent's only published rules for Petitioner's phone calls. *See id.* (quoting prohibited-act codes 197, 297, 397 from 28 C.F.R. § 541.3 Table 1).

180. "[C]ertain things remain federally protected," including Petitioner's "discussions with [his] wife about 1) lawyers, 2) [his] case and 3) the intersections of the aforesaid with the press." *Id.*

181. "So my wife and I cannot nonfrivolously be said to have been doing anything illegal. Likewise all the 'Greatest category' prohibited acts involve actual crimes, as one can see by looking-up 28 C.F.R. § 541.3 Table 1. So scratch from the list code 197" (Use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act). *Id.*

182. Next Petitioner dispatched with code 297 (Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a High category prohibited act): "I get just two calls per week and three in November and December, for which I sign-up at least a few days in advance[, ...] such that the Justice Department knows well my 'frequency of phone use, content of [my] call[s and] the number called.'" *Id.* (first alteration added). "[N]othing I've

ever discussed with my wife has ever involved *any* mischief on my end of the phone line, so none of the other 'High category' prohibited acts are cognizable." *Id.* (emphasis in original).[20]

183. "And ditto code 397" (Use of the telephone for abuses other than illegal activity which do not circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a Moderate category prohibited act). *Id.*

184. Petitioner was sure to note: "I have already overcome vicious retaliation to exhaust my administrative remedies here as to the unconstitutional vagueness of the rules in 28 C.F.R. Sec. 541.3 Table 1 as applied to my communications." *Id.* (citing Ex Post Facto BP-11 As Subm., *Lanner*, dkt. 100-49; Ex Post Facto BP-11 Cent. Office's Resp., *Lanner*, dkt. 100-59 at 2).

185. "In fact, I'm in Court right now on this very issue as it applies to my phone calls." *Id.* (citing Suppl. Pet., dkt. 5-1 at 4 (citing Amended Reply In Support of Petition at 8—10, 17—19, *Lanner*, dkt. 101)).

186. "I feel I exhausted[...] as to retaliation when I submitted a timely BP-8 that went totally unanswered." *Id.* (citing The Eisele BP-8, *Lanner*, dkt. 18 at 30; ERJ Decl. at 34, ¶¶ 253—54, *Lanner*, dkt. 100 at 52 (The Eisele BP-8 was never answered)).

187. Respondent read Petitioner's message before Petitioner's call the next morning, as evidenced by Respondent's processing of said message. *See also* CMU P.S. (unmonitored communications are limited to attorneys).

188. And that next morning Petitioner indeed received his whole call with his wife.

189. Then, ca. 10:45 A.M. Mon., Dec. 19, 2022, at mail call in the CMU chow hall, Petitioner turned in to Eisele and Wheeler 1) Matthews BP-10 Re Court-access IR 3338082 IV, 2) Req. for Memo. and 3) Suppl. Pet. Again, these were each read for contents, *supra*, ¶¶ 142, 146.

190. Less than five hours later, ca. 3:00 P.M. Mon., Dec. 19, 2022, Eisele called out to Petitioner and found him in the unit law library.

191. Eisele had a new Inmate Financial Responsibility Program (IFRP) contract, essentially a demand that Petitioner pay $1,300 almost immediately or forfeit his RDAP eligibility. *See, e.g.,*

---

[20] Code 297 was written for conduct unlike any Petitioner has ever been accused-of, *e.g.*, using another prisoner's phone account, using a cell phone, using a staffer's phone without permission, using a call forwarding service or talking in code.

U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5380.08 Financial Responsibility Program, Inmate (Aug. 15, 2005) ("IFRP P.S.") at ch. 8 (inmates who refuse the requested IFRP payments "will not receive an incentive for participation in residential drug treatment programs" (quoting 28 C.F.R. § 545.11(d)(11)) ("Incentives are defined as early release, [...]")); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5331.02, Change Notice 2, Early Release Procedures Under 18 U.S.C. § 3621(e) (Sept. 27, 2017) at ch. 11(b)(2) ("a change in [...] early release status" would include "noncompliance with FRP").

192.  Eisele told Petitioner the exact $1,300 amount had been calculated using "the same formula as before."

193.  By this Eisele meant the formula that former-CMU Manager Mr. Todd Royer used to put Petitioner—who had always previously complied with IFRP—into IFRP-refusal status following Petitioner's reporting of Royer's sexual abuse. *See* ERJ Decl. at 51, ¶¶ 370–74, *Lammer,* dkt. 100 at 69 (Royer demanded payments of $300 per month and higher from prisoners who had filed against him).

194.  Almost immediately upon Petitioner's transfer to U.S.P. Marion on Jan. 21, 2022, he went back into compliance with IFRP, on a $25-per-quarter schedule, i.e. one forty-eighth the amount Royer had demanded.

195.  After Petitioner gave Eisele his request for a timeliness memo. detailing her own inaction to separate Petitioner from a sexual abuser and her adverse actions against Petitioner after he reported that sexual abuse, *supra,* ¶¶ 163–77, 189, Eisele demanded more money from Petitioner for IFRP in a short period than Royer ever had and 52 times more than his unit team had at U.S.P. Marion.

196.  As Petitioner's case manager, Eisele was the wrong official to approach Petitioner with an IFRP contract. *Contrast* IFRP P.S. at chs. 7 ("It is the Unit Manager's responsibility to monitor all applicable IFRP assignments and payment activity in the unit, and to ensure that accurate IFRP information is reflected in the IFRP SENTRY Module"), 8(b) ("The Unit Manager is the determining authority when it comes to deciding whether an inmate's IFRP payments are commensurate with his/her ability to pay. This decision is solely at the discretion of the Unit Manager and is to

be decided on a case-by-case basis").

197. Petitioner had nowhere near the $1,300 Eisele demanded in a single payment in his commissary account and could not remember a time when he ever had had such an amount in his account. *See* Fed. Bureau of Prisons, TRULINCS Account Transactions—Commissary, Personal Inmate Information, Gottesfeld, Martin, 3:12:45 P.M. Dec. 19, 2022 ("Available Balance: $292.33"), Exh. 7.

198. Because Petitioner had just transferred from another BOP institution 39 days earlier, the BOP's own computer system showed his "Funds Considered for FRP Payments" as "$0.00" and still does so today. Normally the system does not begin considering funds for IFRP payments until a prisoner has been at the particular institution for six months.

199. Petitioner logged into the system in front of Eisele and showed her that none of his funds were yet considered for IFRP but she was unmoved.

200. Petitioner's unit manager had never spoken to him about IFRP. The last time Petitioner had seen his unit manager was weeks before, close to the Thanksgiving holiday.

201. Petitioner signed the IFRP contract under duress and asked Eisele for a copy of the signed contract for his records.

202. Eisele agreed to copy the contract for Petitioner but never did so.

203. That night Petitioner typed a message to his wife detailing what had happened. *See* First CORRLINKS Msg. from M. Gottesfeld to D. Gottesfeld Re Eisele and IFRP, 7:45 P.M. Dec. 19, 2022, Exh. 8 (quoting Req. for Memo. at ¶¶ 2–12) (other citations omitted).

204. Petitioner was clear: "Eisele *et al.* are now trying to extort my silence as to her and Royer's PREA violations by demanding I pay $1,300 into the [IFRP]." *Id.* (emphasis in original).

205. "In contrast, my previous IFRP payment at U.S.P. Marion was $25 every three months." *Id.*

206. "And this is quite consequential to *Gottesfeld v. Rule*, [2:22-cv-871-JRS-MJD (S.D. Ind.)]. It would add more than a year to my sentence." *Id.* (citing IFRP P.S. (quoting 28 C.F.R. § 545.11(d)(8), (11))).

207. Petitioner was leery from past experience that Respondent might block the above message but allow Petitioner's other messages to pass such that Mrs. Gottesfeld would not become aware of

Eisele's $1,300 IFRP demand following Petitioner's request for a timeliness memo. Cf. ERJ Decl. at 6, ¶¶ 48—55, Larmer, dkt. 100 at 24 (Respondent blocked Petitioner's message to his wife regarding service of process until after a court hearing then untimely delivered an incident report against Petitioner) (citations omitted).

208.  Petitioner thus sent a separate message to his wife referencing the first one. See Second CORRLINKS Msg. from M. Gottesfeld to D. Gottesfeld Re Eisele and IFRP, 7:48 P.M. Dec. 19, 2022, Exh. 9 ("Please see my separate, more detailed and very urgent reply to this same message a few minutes ago").

209.  Petitioner was sure to note to his wife: "If we do not have our phone call tomorrow at noon I would assume very foul play is afoot here in Indiana." Id.

210.  Petitioner then also sent a concise update to journalists, attorneys and other family members:

> Please be advised Bureau of Prisons Case Manager Ms. Rebekka Eisele is now extorting me for money in retaliation for, at least, 1) my reporting of her former manager, Mr. Todd Royer, under the Prison Rape Elimination Act (PREA); 2) my reporting of her for failure to separate Royer from me after Royer's sexual voyeurism, in violation of 28 C.F.R. §§ 115.6, 115.64(a)(1); and 3) my litigation of Gottesfeld v. Rule, 2:22-cv-571-JRS-MJD (S.D. Ind.), to gain my freedom.

CORRLINKS Msg. from M. Gottesfeld, 7:52 P.M. Dec. 19, 2022, Exh. 10.

211.  The next morning Respondent blocked each of the above CORRLINKS messages, Exhs. 8—10, and, before Petitioner's scheduled noon phone call with his wife, deleted Petitioner's approved contact entries for Mrs. Gottesfeld and the executive producers of the NBCUniversal docuseries, i.e. 1) Mr. David Metzler, 2) Mr. David Kushner and 3) Ms. Meredith Wright.

212.  Having received no formal notification of any kind, Petitioner resubmitted his wife's contact information immediately for re-approval.

213.  Almost immediately Respondent changed Petitioner's wife's contact entry from pending administrative approval to blocked.

214.  In Petitioner's experience the above events are consistent with action at the local level in Terre Haute because the Bureau's CTU staff in Washington are more familiar with the process to block contacts and far less likely to delete contact entries that they instead mean to

15

to block, as apparently happened this particular time.

215. Petitioner asked Wheeler a few minutes later about the deleted contacts, ca. 9:45 A.M. Dec. 20, 2022, at mail call, in the CMU chow hall.

216. Wheeler indicated to Petitioner that the contacts had been deleted for "third-party communication."

217. Petitioner asked Wheeler for paperwork documenting the deletions and the block of his wife.

218. Wheeler indicated to Petitioner that no such paperwork would ever be forthcoming.

219. Wheeler further took obvious exception to Petitioner's requests to preserve evidence for litigation. She purported to dictate that she and the BOP at their sole discretion would decide which evidence to preserve, and, expressly, neither Petitioner nor this Court would tell her otherwise.

220. Wheeler told Petitioner expressly that she intended not "to pull any punches" against him.

221. In addition to multiple cameras and microphones in the CMU chow hall, Petitioner's talk with Wheeler was witnessed by no fewer than three staff members and likely a dozen other prisoners.

222. Petitioner notes that Respondent has never promulgated any rule about third-party communication. *See, in toto,* Disc. P.S. at Table 1 Prohibited Acts and Available Sanctions (no such rule); *cf., supra,* ¶¶ 178–86 (enumerating Respondent's phone rules as not reaching any of Petitioner's conduct with his approved contacts and noting exhaustion under the unconstitutional-vagueness-as-applied theory) (citations omitted).

223. Petitioner did not have his noon call with his wife that day and has remained blocked from her ever since.

224. Petitioner immediately reported to his remaining contacts and to the Bureau of Prisons National Policy and Programs Coordinator A. Noble that Wheeler clearly intended to spoliate relevant evidence in violation of this Court's Order at § I, *Lammer,* dkt. 9 at I.

225. The effects of Petitioner's reportage seemed obvious at mail call the next day, when

Wheeler seemed to back pedal a bit about the preservation of evidence.

226.  Wheeler stated that the camera in the law library could not make-out which exact documents Petitioner had placed in his manila envelope, and, therefore, she claimed, the footage was not useful for Petitioner's purpose. *See* Inmate Request to Staff Re Preservation of Audio and Video, Dec. 9, 2022, Exh. 26 to Suppl. Pet., dkt. 5-1 (request for "the preservation against spoliation or other loss of the video evidence recorded ca. 0915 hrs. today, Friday, December 9, 2022, of myself in the D-unit law library, demonstrating for the camera each of the pages placed into each of my envelopes of relevant remedy filings, and the continuous footage from the cameras in D-unit showing my walk directly from the law library, envelopes in hand and never disturbed, to the chow hall, where I then asked Ms. Eisele—this part to include the relevant audio—for timeliness memos. on the basis that regional may choose to disbelieve the delivery dates on the DHO reports[...]").

227.  Petitioner had only taken to making such evidentiary requests due to idiosyncracies specific to the D-unit (CMU) team at FCI Terre Haute.

228.  Petitioner was accustomed to particular difficulties with his remedy filings. *See,* *e.g.,* ERJ Decl. at 26, ¶ 196 (Reynolds included memo. of C.O. S. Harvey in appeal of IR 3237478), *Lammer,* dkt. 100 at 44; ERJ Decl. at 29, ¶ 226 (Memo. of C.O. S. Harvey had been removed from remedy mailing), *Lammer,* dkt. 100 at 47; ERJ Decl. at 17, ¶¶ 138—41 (remedy packets commonly jumbled when returned to Terre Haute CMU prisoners, Eisele had Mr. Kenneth Watford's cell destructively searched for his stapling of a remedy prior to its submission to avoid mishandling thereof); Petition at 20, ¶ 80 (no staffer was able to provide insight into how a remedy Petitioner mailed to regional ended up rejected by the central office), dkt. 1.

229.  Petitioner had a productive professional relationship with his unit team at U.S.P. Marion.

230.  Pursuant to Petitioner's positive relationship with his Marion unit team he began marking his remedy and court envelopes to list each individual document contained therein. *See,* *e.g.,* Matthews BP-11 Re Court-access IR 3338082 Proof of Mailing, Sept. 30, 2022, *presum.* the last page of dkt. 1-18 (image of envelope listing "CONTENTS").

231. Petitioner then demonstrated to his unit team that each page identified on such an en-velope was indeed present when he turned over care, custody and control of the envelope for mailing, such that the receiving official would have personal knowledge that Petitioner had turned over a complete filing as indicated on the envelope itself.

232. This process never took more than about a minute or so during mail call and never caused any problem at Marion.

233. Petitioner sought to continue this same procedure upon his return to Terre Haute. *See, e.g.,* Matthews BP-10 Re Court-access IR 3338082 IV Dedupl. Proof of Mailing, Dec. 16, 2022, last page of Exh. 30 to Sec. Suppl. Pet., dkt. 7-1 (image of envelope listing "CONTENTS").

234. Wheeler herself seemed to take no issue with the practice.

235. Eisele, however, interjected into Petitioner's demonstration of one such remedy mailing to Wheeler on an earlier day, before his Dec. 9, 2022, evidentiary request, *supra*.

236. Eisele emotionally told Wheeler and Petitioner: "We're not doing that."

237. Eisele claimed it would take too long.

238. Given all the odd happenings and outright mishandling of Petitioner's remedy filings at Terre Haute—*see, in toto,* ERJ Decl., *Lammer,* dkt. 100—Petitioner believes Eisele had an obvious ulterior motive, i.e. to enable continued mishandling of Petitioner's remedies.

239. During Petitioner's conversation with Wheeler at mail call Dec. 21, 2022, Wheeler also indicated to Petitioner that the unit team would not provide the timeliness memo. he needed to appeal the Court-access IR 3338082 administratively.

240. But Wheeler further told Petitioner that the unit team would not formally confirm or deny whether it had provided the memo. Because Petitioner cannot seal his remedy mailings and the unit team hand delivers the responses thereto, the unit team could and would remove any such memo. from any returned mailing, had the unit team provided the memo. in that particular instance.

241. Wheeler agreed with Petitioner that no part of remedy policy whatsoever contemplates staff memos. and that staff memos. are a retrofit *ad hoc* to the remedy procedures.

242. Petitioner submitted a relevant request to preserve the audio and video evidence of 1) his placing each document for Matthews BP-10 Re Court-access IR 3338082 IV in the envelope, 2) his

giving the remedy and request for a staff memo. to Wheeler, 3) his conversation with Eisele about IFRP, 4) his showing Eisele his funds considered for IFRP as $0.00 in the computer, 5) his agreement with Eisele that Eisele would give him a copy of the signed IFRP contract, 6) Eisele's assurance to him that the new $1,300 IFRP demand was calculated by "the same formula as before," and 7) his discussion with Eisele and Wheeler about his blocked contacts, that no paperwork would be forthcoming to him about the blocked contacts and that the BOP at its sole discretion would decide which evidence, if any, to preserve for litigation. *See* Inmate Request to Staff Re Preservation of Audio and Video Evidence, Dec. 21, 2022, Exh. 11.

243.  Petitioner gave the above request to his unit team the next day, Dec. 22, 2022.

244.  Petitioner later wrote a request to preserve his conversation with Wheeler, *supra*, ¶¶ 225–26, 239–41 (Wheeler claimed footage was unclear, admitted that staff memos. are not part of formal remedy procedures). *See* Inmate Request to Staff Re Preservation of Audio and Video Evidence, Dec. 29, 2022, Exh. 12. Petitioner gave that request to his unit team Dec. 30, 2022.

245.  Petitioner herein incorporates his assertion: "Respondent cannot deny him the requested memo. [to appeal the Court-access IR 3338082] without conceding the unavailability of the remedy procedures as they are found in the administrative rulebook." Sec. Suppl. Pet. at ¶ 139, *presum.* dkt. 7-1 at 5.

246.  "It is for the central office, not for Respondent, under Respondent's own [purported, *ad hoc*] rules, to determine the sufficiency of the memo. as requested." *Id.*

247.  "Petitioner, in his [request for the memo.], merely requests Respondent verify the facts as delineated" by Petitioner. *Id.*

248.  Regardless, 1) Petitioner exhausted on many relevant grounds, 2) exhaustion was inapplicable for many reasons and 3) Respondent is properly estopped from raising nonexhaustion. *Supra*, ¶¶ 103–15 (citations omitted). The Court should find the IR unconstitutional, as pleaded, *id.*

VIII.  **Respondent must return Petitioner's GCT for the *RT* IR 3549119.**

249.  Sufficient background regarding the *RT* IR 3549119 is already herein-incorporated from the ERJ Decl. at ¶¶ 391–99, 404, 439–40, *Lanner*, dkt. 100.

250.  Petitioner's many news outlets that publish his writing and other commentary include

RT. *See* Martin Gottesfeld, *My life in a US death-row prison complex plagued by killings, Covid and abuse, while the executioners get busy*, RT (July 2021).

251.  Respondent knew that Petitioner's wife edits his work for *RT*, including the aforecited article, because Respondent monitored Petitioner's and Mrs. Gottesfeld's communications during the editing process. *See, generally, supra,* ¶¶ 137, 143—44, 147—48, 160—61 (Respondent live monitors and intercedes in real time in Petitioner's calls with Mrs. Gottesfeld) (citations omitted).

252.  Respondent nevertheless charged Petitioner with circumvention of communications monitoring when Mrs. Gottesfeld published quotations from Petitioner at *RT* about Respondent's illegal acts in violation of PREA. *See* RT, *'The law doesn't apply in America anymore,' hacktivist Marty Gottesfeld talks to RT from jail* (Sept. 18, 2021), available at https://www.rt.com/usa/535207-marty-gottesfeld-law-interview/amp/.

253.  Then, as if to prove Petitioner correct in the above *RT* headline, Respondent found Petitioner guilty of the charge Dec. 1, 2021—more than a year before Petitioner opened this case.

254.  Nearly five months after the discipline hearing Petitioner began filing remedies to obtain, as is his right, a written statement of findings from the factfinder who heard the *RT* IR 3549119, Mr. Jason Bradley.

255.  Subsequently to the events recited in ERJ Decl., *Lammer,* dkt. 100, Petitioner received BOP Regional Director Mr. Andre Matevousian's response to his relevant remedy filing: "Your allegation has been referred to the appropriate authorities for investigation. A thorough investigation will be conducted and you will be notified of the outcome." Bradley BP-10 Re *RT* IR 3549119 Reg. Director's Resp., July 1, 2022, *presum.* dkt. 1-20 at 1.

256.  The roundtrip time for regional's answer was 94 days. *See* Bradley BP-10 Re *RT* IR 3549119 Proof of Mailing, Apr. 29, 2022, *Lammer,* dkt. 100-68 at last page and Bradley BP-10 Re *RT* IR 3549119 Reg. Director's Resp., *presum.* dkt. 1-20 at 1 ("I/M received 8/1/22 N[athan ]S[impkins]").

257.  Regional provided no definite time frame in which the BOP would resolve the remedy. *Id.*

258.  Petitioner forthwith completed and mailed a central-office appeal of regional's unproductive answer. *See* Bradley BP-11 Re *RT* IR 3549119 As Subm., Aug. 1, 2022, *presum.* dkt. 1-21 ("I

seek only the DHO report re incident report (IR) 3549119 to comply with my due-process right to a copy of the factfinder's written reason(s) for the action taken, or, in the alternative, the expungement of the IR") (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (due process requires, *inter alia*, the ability to call witnesses, disclosure of exculpatory evidence, an impartial decisionmaker and written findings)).

259. Petitioner asserted: "A relevant [Office of Internal Affairs] inquiry, as alluded-to by Reg. Dir. Matevousian in his response, does not negate these policy or due-process requirements." *Id.*

260. "Unit Manager Mr. Todd Royer was subject of the call in question and I had and have PREA complaints filed against him. Bradley, the DHO, retaliates against my PREA reporting of Mr. Royer, Bradley's friend and fellow DHO, and violates BOP policy and PREA." *Id.* (citing 28 C.F.R. §§ 115.54, 115.64(a)(1), 115.67(a); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5264.08 Inmate Telephone Regulations (Jan. 24, 2008) ("Phone P.S.") ("Inmates may submit telephone numbers for any person they choose, including numbers for [...] news media"); Disc. P.S.).

261. "I was denied witnesses, *e.g.*, Ms. Jodi Wampler." *Id.*

262. Petitioner further asserted he was denied "exculpatory evidence, *e.g.*, a copy of the call audio to challenge the transcription." *Id.*

263. Petitioner also asserted he was denied "an impartial decisionmaker, i.e. not Royer's fellow [FCI Terre Haute] DHO Buddy." *Id.*

264. "The IR and withholding of Bradley's DHO report are parts of a retaliation campaign by [FCI Terre Haute] staffers Bradley, Royer, Siereveld, Lammer, Eisele, Wheeler, Baker, Sherman, Edwards *et al.* and West Virginia staffers, *e.g.*, Jodi Wampler, in violation of PREA and U.S. Const. amend. I." Bradley BP-11 Re *RT* IR 3549119 Cont. Pg., Aug. 1, 2022, *presum.* dkt. 1-21 at 2.

265. "My calls are not subject to my securing assurances not to be quoted to the press, esp. regarding flagrant violations of Bureau of Prisons communications-management unit (CMU) staffers of the Prison Rape Elimination Act (PREA)." *Id.*

266. Ca. 81 days later Petitioner received Bradley BP-11 Re *RT* IR 3549119 Rem. Ack. & Ntc. of Ext., Oct. 21, 2022, *presum.* dkt. 1-22. A formal response was promised by Oct. 24, 2022. *Id.*

267. "As of Dec. 5, 2022," when Petitioner opened this case, he had "received neither the relevant DHO report nor an answer from the central office." Petition at ¶ 74, dkt. 1 at 18.

268. Under relevant policy and regulation, the matter was thus exhausted before Petitioner filed this case. *See* ARP P.S. at ch. 12 (quoting 28 C.F.R. § 542.18 ("If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level")).

269. "Further," Petitioner noted when he opened this case, "for Respondent to produce the DHO report now, more than a year after the hearing and months after Petitioner's rightful release date, is a constructive denial of the report for use in habeas proceedings that cannot be remedied, especially at the glacial pace Petitioner has documented for Respondent's handling of remedy filings required before Petitioner can go to the Court." Petition at ¶ 75, dkt. 1 at 18–19 (citing *cf. IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 526 (7th Cir. 1996) (Posner, J.) (unjustifiable delays are constructive denials, "Otherwise the lower court or agency would have the judicial or administrative equivalent of a pocket veto")); *see also, in toto,* ERJ Decl., *Lammer,* dkt. 100 (remedies consistently delayed long past relevant response deadlines or illegitimately rejected); *supra* (same).

270. Petitioner noted at the outset of this case: "And it's anything but unintentional. As Petitioner already told this Court:

> The CMU program stakes its supposed legitimacy on holding prisoners from gen. pop. based on their discipline histories. Prisoners with guilty findings for IRs cannot generally leave until they are discipline-free for a year or more. In practice—and in my case in particular, as well as other politically sensitive cases—new IRs are filed as older ones age out or are expunged, such that when prisoners' designations are reviewed they each have at least one IR, often frivolously unconstitutional, that is too recent to have exhausted and taken to court. By the time each could dispose of his current disciplinary obstacle, Respondent *et al.* have concocted a new one and, *e.g.*, withheld the DHO report or rejected legitimate remedies.

Petition at ¶ 76, dkt. 1 at 19 (quoting ERJ Decl. at 18, ¶ 142, *Lammer,* dkt. 100 at 36).

271. Petitioner continues to assert herein: "Because Respondent [] withheld the DHO report for *RT* IR 3549119 long past when Petitioner could hope to have sufficient time to challenge its findings—as well as because the IR itself is plainly retaliatory—Respondent must now expunge *RT* IR 3549119 and return Petitioner's 27 days GCT that was taken as a result of it." *Id.* at ¶ 77.

272.  On Tue., Dec. 6, 2022, Respondent read Petitioner's assertion of his due-process right to the DHO report, pleaded in the original Petition. *See, supra,* ¶¶ 141–42 (Wheeler confirmed the mailing of the Petition no later than Dec. 6, 2022) (citing CMU P.S. at ch. 5(c)(1) (mail to U.S. courts and judges is read for contents)).

273.  "Petitioner was then less than surprised the morning of Thu., Dec. 8, 2022, when agent of Respondent Case Manager Ms. Rebekka Eisele delivered to him the" overdue DHO report for *RT* IR 3549119. Suppl. Pet. at ¶ 94, *presum.* dkt. 5-1 at 2.

274.  The DHO report had remained missing "a full year" after the relevant hearing and despite numerous remedies. *Id.* (citation omitted).

275.  Petitioner noted the report was "turned over only *after* he filed Petition with this Court seeking relief from the deprivation of [GCT] without written findings and Respondent read that Petition." *Id.* (emphasis in original; citation omitted).

276.  "Instead of delaying more than a year after the relevant discipline" hearing, "Respondent's own policy prescribes: 'The DHO gives the inmate a written copy of the decisions and disposition, ordinarily within 15 work days of the decision.'" *Id.* at ¶ 96 (quoting Disc. P.S. at ch. 5 (citing 28 C.F.R. § 541.8(h))).

277.  "When Eisele delivered the DHO report[] to Petitioner she was sure to tell him: 'You have 20 days to appeal.'" *Id.* at ¶ 97.

278.  Petitioner, however, did not and does not "stipulate that Respondent's untimely delivery of the DHO report[]—only after Respondent had read Petition—oblig[es] Petitioner to begin the remedy process anew prior to seeking judicial review, especially months after his rightful release date." *Id.* at ¶ 98.

279.  Petitioner had "still received no response to his Bradley BP-11 Re *RT* IR 3549119, [*presum.* dkt. 1-21]." *Id.* at ¶ 99.

280.  That response remained "overdue." *Id.* (citing Bradley BP-11 Re *RT* IR 3549119 Rem. Ack. & Ntc. of Ext., Oct. 21, 2022 (response had been due since Oct. 24, 2022), *presum.* dkt. 1-22).

281.  Petitioner reiterated that, because Respondent had missed the BP-11-answer deadline, "All issues pleaded in the BP-11 remain exhausted." *Id.* (citation omitted).

282. Petitioner continues to assert: "The retaliatory nature of the *RT* IR 3549119 is especially obvious upon contrast to the charged prohibited-act code: 'Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a High category prohibited act.'" *Id.* (quoting Disc. P.S. at Table 1 (quoting 28 C.F.R. § 541.3 Table 1 at code 297)). *See also, supra,* n. 20 (listing intended uses of code 297).

283. "Neither the IR nor anything else provides a scintilla of evidence that staff were unable to monitor Petitioner's 'frequency of telephone use, content of [his] call, or the number called' and talking to and being quoted by the press is not 'a High category prohibited act' or an act in furtherance thereof." Suppl. Pet. at ¶ 99, dkt. 5-1 at 4 (quoting code 297; alteration in Suppl. Pet.).

284. Petitioner requests that the Court order Respondent to return Petitioner's GCT on the bases pleaded in the Bradley BP-11 Re *RT* IR 3549119 As Subm., *presum.* dkt. 1-21. To wit 1) the IR was retaliatory; 2) no evidence supports the finding Petitioner violated prohibited-act code 297 as it is worded; 3) Petitioner was denied witnesses without sufficient reason; 4) Petitioner was denied exculpatory evidence without sufficient reason, *e.g.,* the call audio to challenge the transcription; and 5) Petitioner was denied an impartial decisionmaker, i.e. one who would actually compare the charged conduct to the prohibited-act code and note the obvious inapplicability of the latter to the former.

285. In the alternative, Petitioner requests that the Court order Respondent to return Petitioner's GCT on the basis that prohibited-act code 297 is unconstitutionally vague as applied as a restraint on Petitioner's protected speech. *See* Amended Reply In Support of Petition at 8—10, *Lammer,* dkt. 101 (Petitioner has exhausted as to vague restraints on his protected speech) (citing Ex Post Facto BP-11 As Subm. Key Pg., *Lammer,* dkt. 100-49 at 1; Ex Post Facto BP-11 Cent. Office's Resp., *Lammer,* dkt. 100-59 at 2; *cf., also,* Amended Reply In Support of Petition at 17—19, *Lammer,* dkt. 101 (analyzing Respondent's prohibited-act code 204 for vagueness as applied to the Court-access IR 3338082) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 109 (1972))).

286. Last, Petitioner asks the Court to order Respondent to return Petitioner's GCT on the

basis that Respondent's withholding of the DHO report for a full year, until months past Petitioner's rightful release date, was a constructive denial of Petitioner's right to procedural due process, *supra*, ¶ 269 (citations omitted).

287.  Otherwise, Petitioner could reasonably expect to exhaust anew ca. Nov. 2023, after his halfway-house-slash-home-confinement date as Respondent calculated it before the filing of this action. *See, e.g.*, ERJ Decl. at 42–52, ¶¶ 315–75, *Lanner*, dkt. 100 at 60 (Royer Sex-abuse BP-10 and -11 took over 11 months for Respondent to answer, from July 7, 2020, through June 21, 2021).

288.  Moreover, the plain fact that Petitioner had to file this action and Respondent only provided the DHO report *thereafter*, upon his screening of the instant Petition prior to mailing it to the Court, reinforces Petitioner's assertion that remedies were unavailable *up through and until after* Petitioner filed this action.

289.  For this same reason Respondent is properly estopped from raising nonexhaustion as an affirmative defense.

290.  Petitioner asserts that providing the DHO report now, more than a full year after the DHO hearing and after Petitioner's remedy filings and postage and other expenses, only theoretically to force Petitioner to exhaust anew months after his rightful release date, would be fundamentally inequitable. "[F]ederal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (excusing federal prisoners from common-law exhaustion for *Bivens* claims).

291.  "Administrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Id.* (quoting *West v. Bergland*, 611 F.2d 710, 715 (8th Cir. 1979), *cert. denied*, 449 U.S. 821 (1980) (internal quotation and alteration marks omitted)). Here Petitioner's immediate liberty interest weighs heavily.

292.  Nonetheless, upon Eisele's advisory to Petitioner: "You have 20 days to appeal," Petitioner acted conservatively to preserve his rights and appealed the DHO report administratively. *See* Bradley BP-10 Re *RT* IR 3549119 II As Subm. Dedupl., Dec. 8, 2022, Exh. 27 to Suppl. Pet., dkt.

5-1.

293.  Petitioner notes that the DHO report is entirely boilerplate; there was no justifica-
tion to delay its delivery to Petitioner for over a year. *See RT* IR 3549119 DHO Rep., Exh. 27 at
3 to Suppl. Pet.

294.  Petitioner further notes that though Eisele accurately annotated the report to reflect
its delivery to Petitioner on Dec. 8, 2022, Bradley claims to have completed the report on Sept.
28, 2022. *Id.*

295.  Petitioner disbelieves Bradley's dating of the report. *See, infra,* ¶ 344 (Petitioner
moves for discovery of Simpkins's remedy memo. for the Bradley BP-10 re TAC IR 3552752 IV, as it
likely indicates the TAC IR 3552752 DHO Rep. did not exist when Simpkins wrote that memo. on Nov.
8, 2022) (citations omitted).

296.  In any event, Bradley demonstrably falsified the report to claim Petitioner had waived
witnesses. *See RT* IR 3549119 DHO Rep. at 1, § III(C)(1), Exh. 27 at 3 to Suppl. Pet. ("Inmate
waived right to witness").

297.  In fact Petitioner requested Ms. Jodi Wampler, author of the *RT* IR 3549119, to testify
as to her ability to monitor 1) Petitioner's frequency of phone use, 2) the content of Petition-
er's call, and 3) the number called, as well as the untimeliness of the IR and other issues de-
tailed in Petitioner's discipline-hearing statement, *e.g.,* her mandatory PREA training, her know-
ledge of the operative prohibition against her retaliating against Petitioner for his reporting of
Royer's sexual abuse and her knowledge that Mrs. Gottesfeld edits Petitioner's work for *RT* such
that no third party was necessary for the quotations in question to have been published. *See U.S.*
Dep't of Justice, Fed. Bureau of Prisons, Form BP-A0294 Notice of Discipline Hearing Before the
(DHO) (electing Jodi Wampler to testify), Exh. 27 at 6 to Suppl. Pet.; *RT* IR 3549119 Discipline-
hearing Statement of Martin Gottesfeld, Exh. 27 at 7-9 to Suppl. Pet., dkt. 5-1.

298.  Petitioner never signed or uttered a waiver of his right to Wampler's testimony and
Respondent cannot credibly now produce one.

299.  Nor did Bradley produce a valid reason to withhold Wampler's testimony. *See RT* IR
3549119 DHO Rep. at 1, § III(C)(3) (no reason specified), Exh. 27 at 3 to Suppl. Pet., dkt. 5-1.

300.  To be clear, Petitioner objects to any construal of his administrative appeal of the newly produced DHO report as a stipulation or assent that the issues pleaded in his earlier remedies are in any way unexhausted, or that remedies were available to Petitioner when he opened this case.

301.  On Dec. 12, 2022, Respondent read Petitioner tell the Court in Suppl. Pet at ¶ 99: "Petitioner has still received no response to his Bradley BP-11 Re RT IR 3549119, [presum. dkt. 1-21]. That response remains overdue." Dkt. 5-1 at 3 (citing Bradley BP-11 Re RT IR 3549119 Rem. Ack. & Ntc. of Ext., Oct. 21, 2022 (response had been due since Oct. 24, 2022), presum. dkt. 1-22). Supra, ¶¶ 145—46 (Respondent read Suppl. Pet. Mon., Dec. 12, 2022) (citations omitted).

302.  "Petitioner was again less than surprised when, after Respondent read [Suppl. Pet.], he belatedly delivered [...] the answer to [his] central-office appeal of [the] RT IR 3549119." Sec. Suppl. Pet. at ¶ 123, presum. dkt. 7-1 at 2 (citing Bradley BP-11 Re RT IR 3549119 As Ans., Dec. 14, 2022, Exh. 29 to Sec. Suppl. Pet.).

303.  "Respondent's central office acknowledged that Petitioner 'allege[s] due process violations regarding the incident report and believe[s his] right to be free from retaliation has been violated.'" Id. at ¶ 124 (quoting Bradley BP-11 Re RT IR 3549119 Cent. Office's Resp., Nov. 10, 2022, Exh. 29 at 4 to Sec. Suppl. Pet.; first alteration in Sec. Suppl. Pet., others applied here; emphasis in Sec. Suppl. Pet.).

304.  "[Y]our allegation was referred to the proper authority for review. A thorough review will be conducted and proper action taken as deemed necessary." Id. (quoting same).

305.  "The central office provided no definite time in which to expect the 'proper action' to be taken.'" Id. at ¶ 125 (quoting same).

306.  The central office stamped Petitoner's BP-11 "RECEIVED AUG 25 2022." Bradley BP-11 Re RT IR 3549119 Form As Ret., Exh. 29 at 2 to Sec. Suppl. Pet., dkt. 7-1.

307.  Respondent took 24 days to deliver Petitioner's remedy to the central office from when Petitioner accurately dated it "1 AUG. 2022." Id.

308.  From the "AUG 25 2022" received date Respondent's central office took a further 77 days to sign the remedy answer "November 10, 2022." Bradley BP-11 Re IR 3549119 Cent. Office's Resp.,

Exh. 29 at 4 to Sec. Suppl. Pet., dkt. 7-1.

309.  A further 33 days passed before that response was delivered to Petitioner "DEC 14
2022." Bradley BP-11 Re *RT* IR 3549119 Rct. of Adm. Rem., Exh 29 at 1 to Sec. Suppl. Pet., dkt.
7-1.

310.  In total, 110 days passed between the central office's receipt of the remedy and its
delivery of its response to Petitioner. *Id.* This was nearly twice the 60-day maximum allowed by
Respondent's own policy. *See* ARP P.S. at ch. 12 (quoting 28 C.F.R. § 542.18 (central office has
60 days in which to answer appeals, i.e. 40 days plus a 20-day extension)).

311.  Petitioner, moreover, spent 199 days between his initial filing of the first relevant
remedy, while sanctions were enforced, only to reach no closer point to administrative relief.
*See* Bradley BP-10 Re *RT* IR 3549119 As Subm., Apr. 29, 2022, *Lanner*, dkt. 100-68.

312.  Petitioner asserts 1) he had exhausted as to the *RT* IR 3549119 before he opened this
case; 2) remedies were never available for the *RT* IR 3549119, as demonstrated by both the region-
al's and central office's assertions of indefinite time frames for administrative relief; and 3)
this Court should order the return of Petitioner's GCT on the bases pleaded, *supra*, ¶¶ 284-85
(the IR was retaliatory, no evidence supports the finding, Petitioner was denied witnesses and
exculpatory evidence without sufficient reason, Petitioner was denied an impartial decisionmaker,
and Respondent's prohibited-act code 297 is impermissibly vague as applied as a restraint on Peti-
tioner's speech).

IX.  **Respondent cannot use the TAC IR 3552752 to prejudice Petitioner.**

313.  Like the *RT* IR 3549119, sufficient background on the TAC IR 3552752 is already herein-
incorporated from the ERJ Decl. at ¶¶ 391-99, 404, 415-19, 442-51, *Lanner*, dkt. 100.

314.  Shortly after the *RT* IR 3549119 Respondent again punished Petitioner for a call with a
journalist, during which Petitioner mentioned PREA violations at FCI Terre Haute.

315.  In this most recent instance, however, Respondent chose not to take Petitioner's GCT,
although the TAC IR 3552752 may still be used to lengthen Petitioner's confinement by, *e.g.*, ap-
plying Petitioner's FSA credit toward supervised release instead of prerelease custody under 18
U.S.C. § 3632(d)(4)(C) on the basis of the TAC IR 3552752 or having allowed the IR to have affec-

ted Petitioner's PATTERN score under § 3632(d)(4)(A)(ii).

316. After the events recited in ERJ Decl., *Lanmer*, dkt. 100, Petitioner received two central-office rejections of Bradley BP-10 Re TAC IR 3552752 III. *See* Bradley BP-10 Re TAC IR 3552752 III As Rej., Sept. 7, 2022, *presum.* dkt. 1-23.

317. Petitioner immediately confirmed he had in fact mailed the Bradley BP-10 Re TAC IR 3552752 III to the North Central regional office, and not to the central office. *See* Bradley BP-10 Re TAC IR 3552752 III Proof of Mailing, *Lanmer*, dkt. 100-81 at 3 (mailed to regional office in Kansas City, KS, not the central office in Washington, D.C.).

318. Petitioner inquired at the institution but no staffer was able to provide any insight as to how a remedy mailed to the regional office arrived at and was rejected by the central office.

319. A review of Petitioner's records showed that he had not mailed any other remedy to the central office ca. the same time as the Bradley BP-10 Re TAC IR 3552752 III such that would have made human error on Petitioner's part plausible.

320. For some time Petitioner and his case manager were developing a procedure *ad hoc* for situations like the TAC IR 3552752, where the North Central regional office rejected Petitioner's remedies for his purported failure to include the corresponding DHO report, but for which no such DHO report actually existed for him to include.

321. Petitioner's case manager agreed that he would write a staff memo. to accompany each of Petitioner's such remedy filings; in each memo. the case manager would write that a search of Petitioner's record revealed the DHO report not to have been filed.

322. When Petitioner and his case manager were on the same page as to how to proceed, Petitioner prepared and turned over for mailing Bradley BP-10 Re TAC IR 3552752 IV, Nov. 5, 2022, *presum.* dkt. 1-24 ("the DHO never wrote and delivered the DHO report") (citing Simpkins's memo.).

323. At that point nearly a year had passed since the relevant discipline hearing on Dec. 1, 2021.

324. Petitioner asserted his right to due process. *Id.* (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (quoting *Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992))

(prisoners entitled to "24 hours [...] written notice," "the opportunity to call witnesses and present documentary evidence," "the opportunity to be heard by an impartial decision maker," exculpatory evidence and "a written statement by the fact finder"); *Wolff v. McDonnell*, 418 U.S. 539 (1974) (same)).

325. "[The TAC IR 3552752] violates U.S. Const. amend. I, PREA and BOP policy." *Id.*

326. "Todd Royer was the sole UDC member, against whom I and others have *Prison Rape Elimination Act (PREA)* complaints filed. Royer was subject of my relevant phone call, over which the charge was brought." *Id.* (citing, *inter alia*, 28 C.F.R. §§ 115.64(a)(1) (staff must seprate alleged victims from sexual abusers), 115.67(c) (BOP must monitor for and promptly correct PREA retaliation, including IRs)). *See also* 34 U.S.C. § 30307(b) (the laws of the United States require the BOP to obey 28 C.F.R. Part 115).

327. "Royer was involved significantly in the incident, was never separated from me or any of his many other accusers and BOP failed to monitor for and promptly remedy this retaliation." Bradley BP-10 Re TAC IR 3552752 IV Cont. Pg., Nov. 5, 2022, *presum.* dkt. 1-24 at 2.

328. "DHO Bradley is Royer's fellow DHO and openly retaliated against my PREA reporting of Royer at the DHO hearing itself, thus violating both PREA and U.S. Const. amend. I, as well as 28 C.F.R. § 541.7(b)." *Id.*

329. "I was denied witnesses." *Id.*

330. Petitioner further asserted he was denied "evidence, *e.g.*, the call audio and transcription, in order to challenge the transcription, and surveillance audio of S.I.S. Ms. Jamie Wheeler's telling me that I may read the same statement from the call out loud in the unit." *Id.*

331. Petitioner further asserted he was denied "an impartial decisionmaker not friends and fellow DHO with Royer, as well as separation from Royer under PREA." *Id.*

332. "Now, absent the DHO report—which [h]as never been produced—I am denied access to court." *Id.*

333. Petitioner further asserted:

The call in question posed no articulable threat to safety or orderly operations; none was ever presented; it was a call to a journalist, Mr. Arthur "Jordan" Bloom of *The American Conservative*. DHO Bradley took exception to my naming Royer to a journalist notwithstan-

ding that policy expressly allowed me to do so: 'Inmate[s] may submit telephone numbers for any person[s] they choose, including [...] members of the news media.'

*Id.* (quoting U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5264.08 Inmate Telephone Regulations ("Phone P.S.") at ch. 8 (Jan. 24, 2008)) (first alteration added here).

334. "Third-party PREA reporting of the type for which Bradley punished me is protected." *Id.* (citing, as *e.g.*, 28 C.F.R. § 115.54 (agency must allow third-party reporting), PREA P.S. (citing 28 C.F.R. § 115.54), U.S. Const. amend. I).

335. "Bradley took open exception to my true reports to journalists re Royer and FCI Terre Haute's systemic failure to follow PREA." *Id.*

336. "I w[as] denied adequate notice of the charge, code 397, which Bradley adopted *sua sponte* during the hearing minutes before his decision." *Id.*

337. Before Respondent mailed the initial Petition, dkt. 1, to the Court, he read therein:

In the month since Petitioner turned over care, custody and control of [the Bradley BP-10 Re TAC IR 3552752 IV] for mailing the BOP has not acknowledged its receipt of the remedy. Having mishandled Petitioner's relevant remedy filings for seven months, until long past Petitioner's rightful release date, Respondent should not be heard to complain about exhaustion. The balance of equities tips strongly in Petitioner's favor given his rigorous attempts to exhaust and Respondent's failures to follow his own policies on DHO appeals, timely handle remedy filings and produce DHO reports.

Petition at ¶ 82, dkt. 1 at 20. *See also, supra,* ¶¶ 141—42 (Respondent reads Petitioner's court filings prior to mailing them) (citations omitted).

338. The next day Petitioner received written confirmation from his Marion case manager that on Nov. 8, 2022, the case manager had written the memo., apparently documenting that no DHO report existed for the TAC IR 3552752, and mailed Bradley BP-10 Re TAC IR 3552752 IV. *See, supra,* ¶¶ 139—40 (quoting Inmate Request to Staff to Nathan Simpkins Re Remedies As Ans., Dec. 7, 2022, Exh. 25 to Suppl. Pet., dkt. 5-1), 320—22 (such memos. by Simpkins were to confirm the lack of a DHO report on file for a particular IR).

339. Petitioner reasonably took Simpkins's response to mean that as of Nov. 8, 2022, no DHO report existed for the TAC IR 3552752.

340. Thereafter, on Dec. 8, 2022, Respondent delivered Bradley's DHO report for the TAC IR 3552752 at the same time he delivered the *RT* IR 3549119 DHO Rep., *supra,* ¶ 273.

341. As, *supra,* ¶¶ 273—78, with the *RT* IR 3549119: 1) Petitioner was less than surprised by

Respondent's timing after Respondent had read Petition, dkt. 1; 2) the report had been missing for a full year after the relevant discipline hearing and 3) Petitioner did not and does not stipulate that Respondent's untimely delivery of the report obliges Petitioner to begin the remedy process anew.

342. Also as with the *RT* IR 3549119, *supra*, ¶¶ 288—91, 1) Petitioner asserts that the plain fact that Respondent produced the DHO report only after Petitioner had opened this case reinforces Petitioner's assertion that remedies were unavailable *up through and until after* that point; 2) Petitioner asserts that Respondent is properly estopped from raising nonexhaustion and 3) Petitioner asserts that forcing him to re-exhaust from the bottom of the salmon ladder would be inequitable.

343. Petitioner notes that, like the *RT* IR 3549119, the TAC IR 3552752 DHO Rep. is also entirely boilerplate, such that there was no justification to withhold it from Petitioner for over a year. *See* TAC IR 3552752 DHO Rep., Exh. 28 at 3 to Suppl. Pet., dkt. 5-1.

344. And, like the *RT* IR 3549119 DHO Rep., *supra*, ¶ 294, Bradley claims to have written the TAC IR 3552752 DHO Rep. on Sept. 28, 2022. *See* TAC IR 3552752 DHO Rep. at 3, Exh. 28 at 5 to Suppl. Pet., dkt. 5-1.

345. Petitioner disbelieves Bradley's dating of the DHO report and moves for discovery of Simpkins's Nov. 8, 2022, remedy memo. because it likely indicates that no such DHO report was on file more than a month after Bradley purports to have written it. *See, supra*, ¶¶ 337—38 (Simpkins's remedy memo. likely notes that no such DHO report existed as of Nov. 8, 2022); ERJ Decl. at ¶¶ 107, 194—96 (Bradley falsified IR 3237478 DHO Rep. and suppressed evidence), 226—27 (Bradley retaliated against Officer Mr. S. Harvey, who documented Bradley's falsification of IR 3237478 DHO Rep. and Bradley and Harvey no whave a separation order), *Lanner*, dkt. 100

346. Bradley's falsifications of the DHO-report dates is material to his credibility and to showing a pattern of such falsifications.

347. Like the *RT* IR 3549119, *supra*, ¶¶ 296—99, Bradley also falsified the TAC IR 3552752 DHO Rep. to indicate Petitioner had waived witnesses when he had not in fact done so; Respondent cannot now credibly produce any such waiver.

348. And, once again, Bradley provided no sufficient reason to withhold the evidence and witnesses that Petitioner had requested. *See* TAC IR 3552752 DHO Rep. at 1, § III(C)(3), Exh. 28 at 3 to Suppl. Pet., dkt. 5-1 (no reason specified).

349. Once again, as well, Petitioner acted conservatively to preserve his rights, *supra,* ¶ 292, and appealed the TAC IR 3552752 DHO Rep. administratively. *See* Bradley BP-10 Re TAC IR 3552752 V As Subm. Dedupl., Dec. 8, 2022, Exh. 28 to Suppl. Pet., dkt. 5-1.

350. But, once again, Petitioner did not and does not stipulate that Respondent's untimely delivery of the DHO report obliges Petitioner to begin to exhaust anew from the beginning. *Cf.*, *supra,* ¶ 278 (same assertion as to the RT IR 3549119).

351. Instead, Petitioner once again asserts that the untimely delivery of the TAC IR 3552752 DHO report was a constructive denial of procedural due process. *See, supra,* ¶ 269 (same assertion as to the RT IR 3549119) (citations omitted).

352. Petitioner further asserts as to the TAC IR 3552752 that Respondent's prohibited-act code 397 is unconstitutionally vague as applied as a restraint on Petitioner's protected speech to a journalist. *See, supra,* ¶¶ 113 (vagueness-as-applied claim as to the Court-access IR 3338082) (citation omitted), 285 (vagueness-as-applied claim as to the RT IR 3549119) (citations omitted).

353. Petitioner also notes that Jasper "Jay" Knabb's relevant conduct at issue in the TAC IR 3552752 was already a matter of public record disseminated by Respondent to every person in BOP custody through Respondent's own law library. *See United States v. Coviello*, 225 F.3d 54, 60 (1st Cir. 2000) (Knabb cooperated in an FBI sting operation that netted multiple felony convictions on multiple defendants); *United States v. Knabb*, 2020 U.S. Dist. LEXIS 173885, No. 11-cr-9-JSW-2 (N.D. Cal. Sept. 21, 2020) (the government filed sealed motion later granted in a sealed order to reduce Knabb's sentence).

354. Petitioner last notes one further development: "Simpkins confirmed the mailing of Petitioner's Bradley BP-10 Re TAC IR 3552752 IV." Suppl. Pet. at ¶ 101, dkt. 5-1 at 5 (citation omitted).

355. As Petitioner truthfully told the Court: "Petitioner is yet to receive any acknowledgement of the remedy from Respondent, let alone an answer." *Id.*

356.  "Petitioner began the remedy process for the TAC IR [3552752] on Apr. 29, 2022—after having not received the DHO report for nearly five months—and he, through no fault of his own, is no closer to its end." *Id.* (citing ERJ Decl. at 56, ¶ 404, *Lammer*, dkt. 100 at 74 (citing Bradley BP-10 Re TAC IR 3552752 As Subm., Apr. 29, 2022, *Lammer*, dkt. 100-69)).

357.  Petitioner asserted: "Respondent cannot rightfully avoid exhaustion by ignoring and illegitimately rejecting timely and adequate remedy filings. To hold otherwise is to make a mockery of the remedy process and turn it into an administrative and judicial pocket veto." *Id.*

358.  Petitioner claimed: "Under any reasonable construction of the law and facts Petitioner has exhausted or is excused from exhausting the issues pleaded in his unacknowledged, unanswered relevant remedy, [the Bradley BP-10 Re TAC IR 3552752 IV, *presum.* dkt. 1-24]." *Id.* at ¶ 102.

359.  Respondent read Petitioner's above pleadings to the Court on Dec. 12, 2022. *See, supra,* ¶¶ 145—46 (Petitioner turned over Suppl. Pet. on Dec. 12, 2022) (citing evidence that Respondent screens Petitioner's court filings for contents before mailing them to the Court).

360.  Petitioner was hardly surprised shortly thereafter when Respondent belatedly acknowledged the Petitioner's remedy. *See* Bradley BP-10 Re TAC IR 3552752 IV Rem. Ack. & Ntc. of Ext., Dec. 20, 2022, Exh. 13.

361.  Respondent claimed to have received it a full month after Simpkins confirmed it had been mailed. *Id.* ("DATE RECEIVED: DECEMBER 8, 2022").

362.  Such a long delay is incredible because it contradicts the normal performance of the U.S. postal service. *See* 39 C.F.R. § 121.1(e) (the lengthiest service standard for First Class U.S. mail is five days and mail to Kansas City, KS, a major city, should arrive faster).

363.  Of course the BOP immediately took its 30-day regional extension. Bradley BP-10 Re TAC IR 3552752 Ntc. of Ext., Dec. 20, 2022, Exh. 13 at 2 ("WE ARE EXTENDING THE TIME FOR RESPONSE").

364.  Respondent's belated acknowledgement provides no reason to expect administrative action in a definite time frame for an issue of PREA retaliation when Respondent's handling of a similar PREA-retaliation issue is on an indefinite time frame that has already stretched years. *See, supra,* ¶¶ 255—57 (regional provided no definite time frame for administrative action for the RT IR 3549119), 304—05 (the central office also provided no definite time frame for administrative ac-

tion as to Petitioner's PREA-retaliation claim for the RT IR 3549119).

365. Regardless, the Court should disqualify the TAC IR 3552752 from lengthening in any way Petitioner's confinement because, as pleaded, 1) the IR is retaliatory, *supra*, ¶¶ 326—28, 335; 2) prohibited-act code 397 is unconstitutionally vague as applied as a restraint on Petitioner's speech, *supra*, ¶ 352; 3) the IR violates the laws of the United States, i.e. 34 U.S.C. § 30307(b) (BOP must follow PREA standards), 28 C.F.R. § 115.67(c) (under PREA BOP must remedy retaliation promptly); *supra*, ¶¶ 325—28, 331, 334—35; 4) Petitioner is factually innocent of any phone abuse and no evidence supports the guilty finding, *supra*, ¶¶ 325, 328, 333—34, 353; 5) Petitioner was denied witnesses and evidence without sufficient reason, *supra*, ¶¶ 329—30; 6) Petitioner was denied an impartial decisionmaker, *supra*, ¶¶ 328, 331, 335; 7) Petitioner was denied adequate notice of the charge, *supra*, ¶ 336; and 8) Respondent's untimely delivery of the factfinder's written report amounted to a constructive denial of procedural due process, *supra*, ¶¶ 341, 351.

### X. If necessary, Petitioner moves for a *Pavey* hearing.

366. The chronology of events herein alleged and incorporated from the *Lanmer* filings gives rise to strong inferences of retaliation rendering further administrative remedies unavailable.

366. These strong inferences are applicable to all of Petitioner's claims, given the consistant adverse consequences reliably demonstrated against Petitioner's remedy filings too numerous for concise summary here.

367. Should Respondent contest exhaustion of any of Petitioner's claims, Petitioner moves for limited discovery and a hearing on exhaustion pursuant to *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008) (district judges to conduct hearings and allow relevant discovery to resolve contested exhaustion defenses).

### XI. Further exhaustion should be excused.

368. Alternatively, should Respondent contest exhaustion, the Court should find that further exhaustion is excused. *See, e.g., Pillow v. Bureau of Prisons*, 2022 U.S. Dist. LEXIS 192489, No. 4:22-cv-713 PSH (E.D. Ark. Oct. 21, 2022) (petitioner excused without trying to exhaust as to withheld FSA credits when his release date was "approximately two weeks away," because "[i]t would be futile to require him to exhaust at this late date") (collecting cases); *Hines v. Crabtree*, 935

F. Supp. 1104 (D. Or. 1996) (excusing exhaustion for RDAP credit, ordering immediate release under § 2241); *Hawkins v. Sproul*, 2020 U.S. Dist. LEXIS 67661, No. 18-cv-2206-NJR (S.D. Ill. Apr. 17, 2020) at *6—13 (prisoner's BP-10 rejected for failure to include DHO report or state date of DHO hearing and disciplinary charge, despite prisoner's stating date of DHO hearing and disciplinary charges, when DHO report had not been delivered until after prisoner opened habeas action; exhaustion excused).

369.  In contrast to Pillow and Hines, *supra*, Petitioner's efforts to exhaust span years and hundreds of pages. *See, e.g.*, ERJ Decl., *Lammer*, dkt. 100 (62-page declaration with 263-page appendix showing efforts to exhaust and detailing the obstacles Respondent erected in opposition thereto).

370.  In another way, Petitioner's situation is materially indistinguishable from Hawkins's, *supra*.

## XII.  This Petition is verified.

I verify that the foregoing is true and correct under the penalty of perjury under the laws of The United States of America. 28 U.S.C. §§ 1746, 2242. Executed Monday, January 2, 2023.


by:
    Martin Gottesfeld, *pro se*
    Reg. no. 12982-104
    Federal Correctional Institution
    P.O. Box 33
    Terre Haute, IN 47808


## CERTIFICATE OF SERVICE

I, Martin Gottesfeld, *pro se*, certify that on Jan. 2, 2023, or my first opportunity thereafter I caused a digital copy of the foregoing document to be served on Respondent in the above-captioned case by mailing this copy to the Court; *see* 28 C.F.R. § 540.203 (mail to U.S. courts and judges is read for contents),


by:
    Martin Gottesfeld

Exh. 1



## Individualized Needs Plan - Program Review   (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: GOTTESFELD, MARTIN  12982-104

SEQUENCE: 01992432
Team Date: 12-07-2022

| | | |
|---|---|---|
| Facility: | THA  TERRE HAUTE FCI | |
| Name: | GOTTESFELD, MARTIN | |
| Register No.: | 12982-104 | |
| Age: | 38 | |
| Date of Birth: | 03-05-1984 | |

Proj. Rel. Date:  03-15-2024
Proj. Rel. Mthd:  FIRST STEP ACT RELEASE
DNA Status:  MIM16001 / 02-18-2016

### Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| THA | A/O COMPLT | A/O COMPLT | 11-16-2022 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| THA | ESL HAS | ENGLISH PROFICIENT | 04-15-2019 |
| THA | GED HAS | COMPLETED GED OR HS DIPLOMA | 06-11-2019 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| MAR | | CMU ANATOMY CLASS | 10-25-2022 | CURRENT |
| MAR CMU | C | MATHEMATICS THEORY | 07-29-2022 | 09-29-2022 |
| MAR CMU | C | CMU DIABETES AWARENESS | 02-11-2022 | 04-29-2022 |
| MAR CMU | C | CMU DRAWING CLASS | 02-11-2022 | 04-29-2022 |
| THA CMU | C | ACE HANDBALL & CULTURE CLASS | 07-27-2020 | 07-27-2020 |
| THA CMU | C | CMU AEROBICS CLASS | 07-18-2019 | 09-12-2019 |
| THA CMU | C | CMU ABS CLASS | 07-06-2019 | 09-12-2019 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|
| *** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 04-12-2019 |
| CARE1-MH | CARE1-MENTAL HEALTH | 08-19-2019 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| C19-RCVRD | COVID-19 RECOVERED | 03-10-2022 |
| NO PAPER | NO PAPER MEDICAL RECORD | 04-02-2019 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 04-12-2019 |
| YES F/S | CLEARED FOR FOOD SERVICE | 04-12-2019 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP QUAL | RESIDENT DRUG TRMT QUALIFIED | 04-20-2022 |
| ED COMP | DRUG EDUCATION COMPLETE | 07-08-2021 |
| ELIGIBLE | 18 USC 3621 RELEASE ELIGIBLE | 04-22-2022 |
| NR WAIT | NRES DRUG TMT WAITING | 03-24-2022 |

### FRP Payment Plan

| Most Recent Payment Plan |
|---|

| FRP Assignment: | PART | FINANC RESP-PARTICIPATES | Start: 01-31-2022 |
|---|---|---|---|
| Inmate Decision: | **AGREED** | $1,300.00 | Frequency: **QUARTERLY** |
| Payments past 6 months: | $25.00 | Obligation Balance: $442,280.00 | |

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|



## Individualized Needs Plan - Program Review   (Inmate Copy)
Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: GOTTESFELD, MARTIN  12982-104

SEQUENCE: 01992432
Team Date: 12-07-2022

**Most Recent Payment Plan**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $200.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | |
| 2 | REST FV | $442,930.00 | $442,280.00 | IMMEDIATE | AGREED |

| | Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|---|
| | | 09-13-2022 | MAR | PAYMENT | INSIDE PMT | $25.00 |

**FRP Deposits**

Trust Fund Deposits - Past 6 months:   $3,075.00          Payments commensurate ?   Y

New Payment Plan:   ** No data **

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 11-20-2019 |
| N-ANGER Y | NEED - ANGER/HOSTILITY YES | 08-23-2022 |
| N-ANTISO Y | NEED - ANTISOCIAL PEERS YES | 08-23-2022 |
| N-COGNTV Y | NEED - COGNITIONS YES | 08-23-2022 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 08-23-2022 |
| N-FIN PV Y | NEED - FINANCE/POVERTY YES | 08-23-2022 |
| N-FM/PAR Y | NEED - FAMILY/PARENTING YES | 08-23-2022 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 08-23-2022 |
| N-MEDICL N | NEED - MEDICAL NO | 08-23-2022 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 08-23-2022 |
| N-SUB AB Y | NEED - SUBSTANCE ABUSE YES | 08-23-2022 |
| N-TRAUMA Y | NEED - TRAUMA YES | 08-23-2022 |
| N-WORK Y | NEED - WORK YES | 08-23-2022 |
| R-LW | LOW RISK RECIDIVISM LEVEL | 08-23-2022 |

**Progress since last review**

WRK listed CMU UNASSG. Limited work assignments available in the CMU. EDC see transcript. Disc., has maintained clear conduct since 09/2021. Hlth., utilize weekly administrative rounds to address any medical/psychology concerns.

**Next Program Review Goals**

** No notes entered **

**Long Term Goals**

** No notes entered **

**RRC/HC Placement**

**Comments**

PREA Risk factors were reviewed. Inmate would benefit from financial programming as there is no evidence he has an established bank account.

PPG6

Exh. 2

```
   THAAD  606.00  *      MALE CUSTODY CLASSIFICATION FORM      *      08-11-2021
PAGE 001 OF 001                                                      13:57:27
                            (A) IDENTIFYING DATA
REG NO..: |12982-104|           FORM DATE: 08-11-2021          ORG: (THA)
NAME....: GOTTESFELD, MARTIN
                                      MGTV: NONE
PUB SFTY: NONE                        MVED:
                            (B) BASE SCORING
DETAINER: (0) NONE              SEVERITY........: (5) HIGH
MOS REL.: 39                    CRIM HIST SCORE: (00) 0 POINTS
ESCAPES.: (0) NONE              VIOLENCE........: (0) NONE
VOL SURR: (0) N/A               AGE CATEGORY...: (2) 36 THROUGH 54
EDUC LEV: (0) VERFD HS DEGREE/GED   DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
                            (C) CUSTODY SCORING
TIME SERVED.....: (4) 26-75%    PROG PARTICIPAT: (0) POOR
LIVING SKILLS...: (0) POOR      TYPE DISCIP RPT: (1) > 1 HIGH
FREQ DISCIP RPT.: (2) 1         FAMILY/COMMUN..: (3) MINIMAL


                    --- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE   SEC TOTAL   SCORED LEV   MGMT SEC LEVEL   CUSTODY   CONSIDER
+7   +10     +2        +9         MINIMUM         N/A             IN     INCREASE



 G0005        TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```



EXH. 3

**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Chief Psychologist*

United States Penitentiary
4500 Prison Road; Marion, IL 62959

April 22, 2022

FOR:       DAP QUAL Inmates at USP Marion

FROM:      Dr. A. Fields, J.D., Psy.D., Chief Psychologist

SUBJECT:  Register Numbers in order of PRD

This is a list of all DAP QUAL inmates at USP Marion in order of your projected release date from nearest to farthest out. I will post a new list every 2-3 weeks. Please do not ask DAP staff where you're at on the list. You will be directed to this list.

| # | | # | | # | | # | | # | |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 56909-039 | 19. | 14483-509 | 37. | 51485-074 | 55. | 18359-030 | 73. | 07609-090 |
| 2. | 18708-030 | 20. | 17658-032 | 38. | 23240-509 | 56. | 51573-380 | 74. | 52927-074 |
| 3. | 51780-074 | 21. | 15352-045 | 39. | 30081-034 | 57. | 21768-026 | 75. | 21985-509 |
| 4. | 18079-030 | 22. | 20009-033 | 40. | 33106-009 | 58. | 28503-031 | 76. | 38263-509 |
| 5. | 21050-026 | 23. | 27825-009 | 41. | 09986-084 | 59. | 15292-030 | 77. | 07432-025 |
| 6. | 66873-056 | 24. | 12985-030 | 42. | 49041-044 | 60. | 61333-018 | 78. | 14657-025 |
| 7. | 72972-097 | 25. | 90619-020 | 43. | 40216-018 | 61. | 51960-424 | 79. | 34902-045 |
| 8. | 15077-010 | 26. | 19351-043 | 44. | 26163-075 | 62. | 36921-509 | 80. | 49044-044 |
| 9. | 26069-075 | 27. | 46802-044 | 45. | 31127-076 | 63. | 42961-044 | 81. | 14818-025 |
| 10. | 33623-171 | 28. | 09136-025 | 46. | 21184-509 | 64. | 67188-060 | 82. | 19021-030 |
| 11. | 20067-033 | 29. | 50219-044 | 47. | 53941-424 | 65. | 52943-074 | 83. | 05098-509 |
| 12. | 17144-059 | 30. | 29566-031 | 48. | 47575-044 | 66. | 32138-045 | 84. | 17820-046 |
| 13. | 30013-044 | 31. | 32065-045 | 49. | 08681-030 | 67. | 23298-032 | 85. | 29872-047 |
| 14. | 54637-074 | 32. | 16841-028 | 50. | 22075-043 | 68. | 09269-070 | 86. | 21354-040 |
| 15. | 70919-019 | 33. | 52900-074 | 51. | 07433-090 | 69. | 26924-009 | | |
| 16. | 16330-089 | 34. | 04281-061 | 52. | 68003-007 | 70. | 24731-509 | | |
| 17. | 17630-003 | 35. | 13430-076 | 53. | 42774-424 | 71. | 35137-001 | | |
| 18. | 24444-031 | 36. | 12982-104 | 54. | 21369-040 | 72. | 26423-078 | | |

Exh. 4

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: DECEMBER 14, 2022


FROM: ADMINISTRATIVE REMEDY COORDINATOR
      DESIG/SENTENCE COMPUTATION CTR

TO  : MARTIN GOTTESFELD, 12982-104
      TERRE HAUTE FCI    UNT: CMU    QTR: D04-040L
      4200 BUREAU ROAD NORTH
      TERRE HAUTE,  IN 47808


FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID      : 1144715-R1     REGIONAL APPEAL
DATE RECEIVED  : DECEMBER 13, 2022
SUBJECT 1      : OTHER SENTENCE COMPUTATION
SUBJECT 2      :
INCIDENT RPT NO:

REJECT REASON 1: YOU SUBMITTED YOUR REQUEST OR APPEAL TO THE
                 WRONG LEVEL.  YOU SHOULD HAVE FILED AT THE
                 INSTITUTION,   REGIONAL OFFICE, OR  CENTRAL
                 OFFICE LEVEL.

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REMARKS        : PER PS 1330.18 ADMINISTRATIVE REMEDIES MUST FIRST BE
                 FILED AT THE FACILITY TO WHICH YOU ARE ASSIGNED AND
                 APPEALED TO THE REGION.

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | GOTTESFELD, MARTIN S. | 12982-104 | D | FCI-THA |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

PLEASE SEE   CONTINUATION PAGE INCLUDED.

| 30 NOV. 2022 (WED.) | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B– RESPONSE**

DEC 13 2022

| | |
|---|---|
| DATE | WARDEN OR REGIONAL DIRECTOR |

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**                               CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

| | |
|---|---|
| DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) |

USP LVN                    PRINTED ON RECYCLED PAPER                    BP–229(13)
APRIL 1982

REQUEST FOR ADMINISTRATIVE REMEDY CONT. PG. 1 OF 1

GOTTESFELD, MARTIN S.          12982-104          D-UNIT  FCI-THA

"[F]ormal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision." 28 C.F.R. § 542.14(d)(5). This is just such a request: BOP's Federal Time Credits (FTCs) auto-calculation application originated in and is overseen by the DSCC, and my single request is for the DSCC to adjust the auto-calculation of my FTCs to obey all laws as follows.

Under 18 U.S.C. § 3585(a) my sentence commenced Jan. 10, 2019. If my credits do not already reflect that I began presumed participation Jan. 10, 2019, then it should be updated to do so. The Bureau has conceded that one may earn FTCs in the community, e.g., before I was taken from the county jail to MDC Brooklyn on Feb. 15, 2019. My credits should reflect I earned 10 days from Jan. 10–Feb. 8, 2022, then 15 days for each 30 days participation thereafter. See, e.g., Pillow v. Bureau of Prisons, 2022 U.S. Dist. LEXIS 192489, No. 4:22-cv-713 PSH (E.D. Ark. Oct. 21, 2022) at *9, ¶¶ 5–6, 14 (prisoner earned 100 days credit for 211-day presumed-participation period, i.e. 10 days for the first 30 days participation then 15 days for each 30 days further participation). In total I should have 370 days' participation from Jan. 10, 2019, to Jan. 14, 2020, and either 180 days time credits or 175 days time credits and 10 days carry-over participation.

Next I took Drug Ed. in 2021, which is a productive activity (PA). The class lasted ca. 10 weeks, i.e. another 70 days participation. That should be either another 35 days time credits, to total 215 days time credits, or another 30 days time credits with another 10 days carry-over participation, to total 205 days time credits and 20 days carry-over participation.

Last, I should have another 321 days participation from Jan. 14, 2022, through the time I'm writing this on Nov. 30, 2022. That should mean either a final 160 days time credits, to total 375 days time credits, or another 150 days time credits with 21 days carried-over, to total 370 days time credits with 11 days carry-over participation, and counting.

The only paperwork I ever received purporting to show my FSA time credits was dated ca. Oct. 27, 2022, and listed 244 days time credits—almost 50 days too few. I have zero visibility into the mechanics of the auto-calculation application so I know not where the discrepency or discrepencies may lie. Any insight would be appreciated.

Thanks for your consideration,


by: _____          30 NOV. 2022 (WED.)
Martin Gottesfeld

**U.S. Department of Justice**

RXW, S

**Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball–point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP–DIR–9 and BP–DIR–10, including any attach–ments must be submitted with this appeal.

| From: | GOTTESFELD, MARTIN S. | 12982-104 | D | FCI-THA |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL** I hereby appeal the rejection of rem. no. 1144715-R1. *See* Rej. Ntc. 1144715-R1 (Dec. 14, 2022) and Timel. Memo., both incl'd. "When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection, including a rejection on the basis of an exception as described in [28 C.F.R.] §542.14 (d), to the next appeal level." Prog. Stat. 1330.18 Administrative Remedy Program ("ARP P.S.") (Jan. 6, 2014) at ch. 11 (quoting 28 C.F.R. § 542.17(c)). My original Request to the DSCC, incl'd, stated: "[F]ormal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision" (quoting 28 C.F.R. § 542.14(d)(5)). "This is just such a request: BOP's Federal Time Credits (FTCs) auto-calculation application originated in and is overseer by the DSCC, and my single request is for the DSCC to adjust the auto-calculation of my FTCs to obey all laws[...]." *Id.* The DSCC's "REMARKS" represent a final denial at the regional level of the construal of the remedy under § 542.14(d)(5): "PER PS 1330.18 ADMINISTRATIVE REMEDIES MUST FIRST BE FILED AT THE FACILITY TO WHICH YOU ARE ASSIGNED AND APPEALED TO THE REGION." Rej. Ntc. 1144715-R1, incl'd. DSCC thus made clear it will not process or reconsider processing an remedy as initially filed with DSCC. But DSCC is mistaken. Federal regulation trumps program statement. Though 28 C.F.R. § 542.14(d)(5) is omitted from ARP P.S. 1330.18, the BOP's law library clearly includes it and the ELL also notes "75 FR 34625, 34626, June 18, 2010, added paragraph (d)(5), effective June 18, 2010." *See* ELL print-out, incl'd.

My single request is thus for the central office to direct the DSCC to process the remedy as it was orginally submit-ted, pursuant to 28 C.F.R. § 542.14(d)(5). BOP's omission in a Prog. Stat. does not negate a valid regulatory promulga-tion. Should central reject this request then § 542.14(d)(5) becomes inoperative in this case, and I will have exhausted.

| 21 DEC. 2022 (WED.) <- SAME DAY I REC'VED THE REJECTION. | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

| | |
|---|---|
| DATE | GENERAL COUNSEL |

ORIGINAL: RETURN TO INMATE

CASE NUMBER: _____

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

| | |
|---|---|
| DATE | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL |

BP-231(13)
APRIL 1982

USP LVN

## § 542.14  Initial filing.

**(a)** Submission. The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred.

**(b)** Extension. Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

**(c)** Form.

  **(1)** The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).

  **(2)** The inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue. For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.

  **(3)** The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 1/2" by 11") continuation page. The inmate must provide an additional copy of any continuation page. The inmate must submit one copy of supporting exhibits. Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.

  **(4)** The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional counselor). CCC inmates may mail their Requests to the CCM.

**(d)** Exceptions to Initial Filing at Institution.

  **(1)** Sensitive Issues. If the inmate reasonably believes the issue is sensitive and the

CFR2 ← _From the BOP_

1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

12982104

inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

(2) DHO Appeals. DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.

(3) Control Unit Appeals. Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.

(4) Controlled Housing Status Appeals. Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.

(5) Other requests for formal review of decisions not originating from the Warden. Other than the exceptions listed above, formal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision, and appealed directly to the General Counsel.

**HISTORY:** [44 FR 62250, Oct. 29, 1979; 58 FR 58246, Oct. 29, 1993; 61 FR 86, 88, Jan. 2, 1996; 75 FR 34625, 34626, June 18, 2010]

[EFFECTIVE DATE NOTE:

75 FR 34625, 34626, June 18, 2010, added paragraph (d)(5), effective June 18, 2010.]

CFR2                                                    2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.





Label 400 Jan. 2013
7690-16-000-7948

UNITED STATES
POSTAL SERVICE®

USPS TRACKING #

9114 9022 0078 9988 6602 21

WEDNESDAY, DECEMBER 21, 2022;

⇔12982-104⇔
Office Of General Counsel
Bureau of Prisons
320 1ST ST NW
Washington, DC 20534
United States

**NAME:** MARTIN GOTTESFELD
**NUMBER:** 12982-104
Federal Prison Camp
P.O. Box 33
Terre Haute, IN 47808

CONTENTS—
•) FORM BP-231(13) ("BP-11");
•) REJ. NTC. 1144715-R1;
•) FORM BP-229(13) ("BP-9")
AS RETURNED; AND
•) FORM BP-229(13) CONT. PG.
AS RETURNED.

Exh. 6

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Bolling, Eric; Brown, Benjamin; Brown, Greg; Camp, Frank; Daniel, Ted; Fortin, Lori; Gosztola, Kevin; Gottesfeld, Dana;
Green, Jeremy; Grim, Ryan; Kiriakou, John; Malkin, Michelle; Mcbreen, Kelen; Mcmillen, Alexi; Newman, Alex; Pavlo, Walter;
Shaffie Atty-At-Law, Shawn; Shaw, Carey M; Sweeney, Chris; Tesoriero, Celeste
SUBJECT: 2022-12-17|Illegal DOJ retaliation
DATE: 12/17/2022 07:48:44 PM


7:48 P.M. Eastern Time, Saturday, December 17, 2022

Re 2022-12-17|Illegal DOJ retaliation
Alt. Subj. **United States v. Gottesfeld**, 16-cr-10305-NMG (D. Mass.)
Alt. Subj. **Gottesfeld v. Rule**, 2:22-cv-571-JRS (S.D. Ind.)
Alt. Subj. **Gottesfeld v. United States**, No. TBD (S.D. Ill.)

Dear Eric, Attorney Brown, Greg B., Frank C., Ted D., Lori, Kevin G., Dana, Attorney Green, Ryan G., John K., Michelle M.,
Kelen, Lexi, Alex N., Walter, Attorney Shaffie, C. Mitchell S., Chris S. and Attorney Tesoriero:

I hereby make the following statement available under the latest Creative Commons by-attribution, derivatives-permitted, share-
alike, commercial-use-permitted license pursuant to the First Amendment and the Bureau of Prisons program statement and
federal regulations on inmate manuscripts.

From the real-life **Chateau d'If**,
/s/ Martin Gottesfeld, Defendant, **pro se**, **United States v. Gottesfeld**, 16-cr-10305-NMG (D. Mass.);
Petitioner, **pro se**, **Gottesfeld v. Rule**, 2:22-cv-571-JRS (S.D. Ind.); and
Plaintiff, **Gottesfeld v. United States**, No. TBD (S.D. Ill.).

I Face Continued, Illegal Justice Department Revenge For Pursuing My Case and Other Protected Conduct, Says MartyG.

As you know from my previous writing, the U.S. Justice Department spends millions of tax dollars every year keeping a lid on
scandals like Operation Fast and Furious and FBI Director Christopher Wray's previous subornation of perjury.  It's never been
easy or risk-free for me to tell you all of the unethical and downright criminal conduct that goes into the Department's efforts.
But recently I've been experiencing something new.

A little under two weeks ago, on December 4th, the U.S. Justice Department went so far as to cut most, but not all, of the power
to its multimillion-dollar black-site communications-management unit (CMU), which I involuntarily call home.  It did so as part of
a fake electrical blackout to preempt one of my very few prescheduled phone calls.  Then, on December 9th, the censors here
cut my call with my wife when she mentioned one of my attorneys by name.  Most recently, last Thursday, December 15th, my
wife and I got about five minutes into our call when I mentioned "lawyers" and the censors cut-off the phone again.

Meanwhile, the Justice Department is stonewalling three (3) separate attorneys who are each requesting unmonitored legal
calls with me.  The Justice Department says it will allow those unmonitored legal calls only when each of my attorneys divulges
exactly what it is that he has to discuss with me and when exactly it is that we intend to file whatever it is that the Justice
Department insists we divulge to it that we're going to file.

As one might assume, the Justice Department's conduct here is blatantly illegal.

In contrast, my phone calls are **supposed to be** governed by Bureau of Prisons (BOP) policy.  (The BOP is an agency of the
Justice Department and theoretically it runs this special black-site prison, which I prefer to call the real-life **Chateau d'If**.)

BOP policy, in turn, enumerates only a few "prohibited acts" for the phone, each with a three-digit prohibited-act code:

197 Use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act.

297 Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of
telephone use, content of the call, or the number called; or to commit or further a High category prohibited act.

397 Use of the telephone for abuses other than illegal activity which do not circumvent the ability of staff to monitor frequency of
telephone use, content of the call, or the number called; or to commit or further a Moderate category prohibited act.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

Until the powers that be finally stake through the heart that pesky Constitution thingy---which they claim to love, are sworn to uphold, yet treat like soiled toilet paper when they're sure nobody's looking---certain things remain federally protected.  These include my discussions with my wife about 1) lawyers, 2) my case and 3) the intersections of the aforesaid with the press.  So my wife and I cannot nonfrivolously be said to have been doing anything illegal.  Likewise all the "Greatest category" prohibited acts involve actual crimes, as one can see by looking-up 28 C.F.R. Sec. 541.3 Table 1.  So scratch from the list code 197.

And, as I wrote above, all my calls here are prescheduled.  Though federal prisoners elsewhere get at least 300 monthly phone minutes and 400 in November and December, here I get just two calls per week and three in November and December, for which I sign-up at least a few days in advance.  American taxpayers are billed truly obscene amounts of money for all my calls to be live monitored, i.e. **in real time**, such that the Justice Department knows well my "frequency of phone use, content of [my] call[s and] the number called."  For the Justice Department to claim otherwise would be, I should think, not only terribly embarrassing for the government, but indicative that perhaps **all that money** is going somewhere other than where the Justice Department claims it is.  Similarly, nothing I've ever discussed with my wife has ever involved **any** mischief on my end of the phone line, so none of the other "High category" prohibited acts are cognizable.  Scratch off code 297.

And ditto code 397.

So why are my calls being totally preempted or cut-off?  Is it perhaps because NBCUniversal has chosen to shine an unflattering light on the federal justice system, my particular prosecutors and a certain group of Branch Harvidians that tortured and crippled a perfectly innocent, very sweet and incredibly brave young lady with whom I share a certain unspoken bond?

If so, that would be totally unlawful, and not the least bit despicable.  I'd need a remedy form ("BP-8").  And a tort presentment form ("Standard Form 95").  And a **very** Jewish lawyer from the ACLU, ACLJ or American Conservative Union.

Worth mentioning, I have already overcome vicious retaliation to exhaust my administrative remedies here as to the unconstitutional vagueness of the rules in 28 C.F.R. Sec. 541.3 Table 1 as applied to my communications.  **See** BP-11 As Submitted, **Gottesfeld v. Lammer**, 2:20-cv-12-JRS-MJD (S.D. Ind.), dkt. 100-49; Central Office's Response to BP-11, **Lammer**, dkt. 100-59 at 2.

In fact, I'm in Court right now on this very issue as it applies to my phone calls.  **See** Supplemental Petition for a Writ of Habeas Corpus (28 U.S.C. Sec. 2241) at 4, **Gottesfeld v. Rule**, 2:22-cv-571-JRS (S.D. Ind.), dkt. no. unknown (citing Amended Reply In Support of Petition at 8--10, 17--19, **Lammer, supra**, dkt. 101).

Similarly, I feel I exhausted---and no Court has yet reached the merits---as to retaliation when I submitted a timely BP-8 that went totally unanswered.  **See** BP-8, **Lammer, supra,** dkt. 18 at 30; Declaration of Martin Gottesfeld re **Exhaustion, Retaliation and Justiciability** at 34, paras. 253--54 (the BP-8 was never answered), **Lammer, supra,** dkt. 100 at 52.

Now, let's see if I get my whole call with my wife tomorrow morning.

And, may I please get the best-available contact information for Kevin McCarthy and James Comer?  I'd like to write them a letter.

Date:   12/19/2022
Time:   03:12:45 PM

Location: THA

## Federal Bureau of Prisons
## TRULINCS Account Transactions - Commissary
## Personal Inmate Information

Inmate No: 12982104   Inmate Name: GOTTESFELD, MARTIN          Available Balance: $292.33

| Date | Reference # | Transaction Type | Sender Last name | Amount |
|------|-------------|------------------|------------------|--------|
| 12/19/2022 | 126 | Sales | | -$189.10 |
| 12/18/2022 | TL1218 | TRUL Withdrawal | | -$10.00 |
| 12/15/2022 | TL1215 | TRUL Withdrawal | | -$10.00 |
| 12/14/2022 | TL1214 | TRUL Withdrawal | | -$10.00 |
| 12/14/2022 | TL1214 | TRUL Withdrawal | | -$15.00 |
| 12/13/2022 | TL1213 | TRUL Withdrawal | | -$10.00 |
| 12/12/2022 | TL1212 | TRUL Withdrawal | | -$10.00 |
| 12/10/2022 | TL1210 | TRUL Withdrawal | | -$15.00 |
| 12/08/2022 | TL1208 | TRUL Withdrawal | | -$10.00 |
| 12/07/2022 | TL1207 | TRUL Withdrawal | | -$10.00 |
| 12/07/2022 | TL1207 | TRUL Withdrawal | | -$15.00 |
| 12/06/2022 | TL1206 | TRUL Withdrawal | | -$15.00 |
| 12/06/2022 | 85 | Sales | | -$157.55 |
| 12/03/2022 | TL1203 | TRUL Withdrawal | | -$15.00 |
| 11/29/2022 | 54 | Sales | | -$49.90 |
| 11/28/2022 | TL1128 | TRUL Withdrawal | | -$30.00 |
| 11/21/2022 | 91 | Sales | | -$158.40 |
| 11/21/2022 | 70171603 | Lockbox - CD | GOTTESFELD | $450.00 |

Inmate #: 12982104

Exh. 8

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Gottesfeld, Dana
SUBJECT: RE: RE: 2022-12-15|Aleph contact info?
DATE: 12/19/2022 07:45:11 PM

7:45 P.M. Eastern Time, Monday, December 19, 2022

My Darling Dana:

Circa 3:02 P.M. Eastern Time today I received your message below.

I hope you are well, and that you received my other messages today.

I have added Rabbi Mockin to my CORRLINKS contacts.  I'll let you know as soon as he is approved.

And that can't come soon enough.

As part of one of my administrative remedies the Bureau's central office in D.C. told me to get a timeliness memo. from Eisele **et al.** to explain why I waited until I had left FCI Terre Haute to file a regional administrative remedy appeal ("BP-10") about the incident report (IR) 3338082, which was in controversy in **Gottesfeld v. Lammer**, 2:20-cv-12-JRS-MJD (S.D. Ind.), and, now, in **Gottesfeld v. Rule**, 2:22-cv-571-JRS-MJD (S.D. Ind.).

I followed central's directive and requested the memo., in writing, ca. 10:45 A.M. today.  The memo. is certainly adverse to Eisele **et al.** because of some of the facts it must verify, **e.g.**

2. Ca. June 27, 2019, I sent a CORRLINKS message accusing Mr. Todd Royer of sexual abuse under the Prison Rape Elimination Act (PREA), i.e. sexual voyeurism, quoting 28 C.F.R. [Sec.] 115.6.

3. Ca. June 28, 2019, I tried to mail a PREA complaint against Royer to the U.S. Dep't of Justice Office of the Inspector General (OIG).  Case Manager Ms. Rebekka Eisele returned the mailing to me the next business day, which I had not been allowed to seal, and she refused to mail it.  Eisele did not separate Royer from me.  **Cf.** U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) (quoting 28 C.F.R. [Sec.] 115.64(a)(1) (responding security staff must "Separate alleged victim and abuser")) ("In the Bureau, all institution staff are 'security staff'").

4. Ca. June 28, 2019, FCI Terre Haute S.I.S. Lt. Mr. Jamie Baker came to the CMU to interview me about the alleged PREA violation, which had been recorded on closed-circuit audio and video that was immediately available for his review.  Lt. Baker did not separate Royer from me.  **Cf.** Prog. Stat. 5324.12, **supra**, [para.] 3.

5. Ca. July 1, 2019, I mailed a declaration to court accusing Royer of sexual abuse under PREA, i.e. sexual voyeurism.  **See Gottesfeld v. Hurwitz, et al.**, 18-cv-10836-PGG-GWG (S.D.N.Y.), dkt. 63 at 5--8 (quoting 28 C.F.R. [Sec.] 115.6).  I later gave a copy of this declaration to FCI Terre Haute S.I.S. Lt. Mr. J. Sherman.  Sherman did not separate Royer from me.

6. Ca. Nov. 26, 2019, I turned in to Eisele an Administrative Remedy--Informal Resolution ("BP-8"), stating, **inter alia**, "My prior attempt to anonymously report a PREA violation by Todd Royer to the OIG led directly to internal S.I.S. Lt. [Mr. Jamie] Baker['s] trying to interview me in the CMU and this was wholly inappropriate[...]  Please fix the current noncompliance with 28 C.F.R. [Sec.] 115.51(b) in the FCI-THA CMU by providing anonymous access to an external PREA hotline or other entity outside the DOJ, and please fix TRULINCS so that the 'Request to Staff' button is no longer disabled in the CMU."  Eisele **et al.** never answered this BP-8.

7. The morning of Mon., Dec. 9, 2019, I handed Eisele remedy no. 1000236-F1, stating, **inter alia**, "My prior attempt to report anonymously a PREA violation by Todd Royer to the OIG led directly to internal S.I.S. Lt. [Mr. Jamie] Baker['s] trying to interview me in the CMU and this was wholly inappropriate" and "Please fix the current noncompliance with 28 C.F.R. [Sec.] 115.51(b) in the FCI-THA CMU by providing anonymous access to an external PREA hotline or other entity outside the DOJ, and please fix TRULINCS to that the 'Request to Staff' button is no longer disabled in the CMU."

8. Later on Dec. 9, 2019, Eisele filed incident report (IR) 3338082 against me, charging me with attempted extortion based on a court-related request I had given to her more than 48 hours earlier on Fri., Dec. 6, 2019.  More than 24 hours had elapsed between my handing Eisele the request in question in the IR and my handing Eisele remedy no. 1000236-F1, and in that time

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------

Eisele did not file IR 3338082; she filed IR 3338082 only after I handed her remedy no. 1000236-F1, **supra**, [para.] 7.  **Cf.** U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5270.09 Inmate Discipline Program (Nov. 8, 2020) at ch. 2 (quoting 28 C.F.R. [Sec.] 541.5 ("You will ordinarily receive the incident report within 24 hours of staff becoming aware of your involvement in the incident")).

9. FCI Terre Haute Lt. Mr. B. Devlin delivered the IR and placed me in [solitary confinement].  I told Devlin immediately upon receipt of the IR that it was retaliatory.  At no point did any FCI Terre Haute staffer ever separate me from Royer.

10. On Dec. 20, 2019, IR 3338082 was decided by Mr. D. Matthews.  Matthews and Complainant Eisele were both case managers at FCI Terre Haute and Matthews and Royer were both alternate disciplinary-hearing officers (DHOs) at FCI Terre Haute.  **See, e.g.,** Malone v. United States AG**, 858 F. App'x 296, 297 (11th Cir. 2021) ("[S]ome facilities also employ alternate DHOs who assist with the disciplinary case load as a 'collateral duty,' meaning that alternate DHOs continue to fulfill their primary job[s]").

11. Either while rem. no. 1000236-F1 was assigned to my then-unit manager Ms. D. Thomas for investigation, or very shortly thereafter, Warden Brian Lammer made Royer my new unit manager.

12. Royer remained my unit manager until my transfer to U.S.P. Marion on Jan. 21, 2022.


Less than five hours after I handed Eisele my written request for that memo., along with a copy to be mailed to the court as an exhibit to my second supplemental petition in **Rule**, i.e. ca. 3:00 P.M. Eastern Time today, Eisele found me in the law library.

Eisele **et al.** are now trying to extort my silence as to her and Royer's PREA violations by demanding I pay $1,300 into the inmate financial responsibility program (IFRP).  In contrast, my previous IFRP payment at U.S.P. Marion was $25 every three months.

Through Eisele's extortionate request she has now perpetrated a separate PREA violation.  **See** U.S. Dep't of Justice, Fed. Bureau of Prisons, Prorgam Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) (quoting 28 C.F.R. Sec. 115.67(a) ("The agency shall establish a policy to protect all inmates and staff who report sexual abuse or sexual harassment [...] from retaliation by [...] staff"), (b) ("The agency shall employ multiple protection measures, such as housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims [...]")).

And this is quite consequential to **Gottesfeld v. Rule, supra**.  It would add more than a year to my sentence, because inmates who refuse the requested IFRP payments "will not receive an incentive for participation in residential drug treatment programs."  U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5380.08 Financial Responsiblity Program, Inmate ("IFRP P.S.") (Aug. 15, 2005) at ch. 8 (quoting 28 C.F.R. Sec. 545.11(d)(11)).  I otherwise qualify under 18 U.S.C. Sec. 3621(e)(2)(B) (residential drug-abuse program participants earn a year off their sentences).

And as part of RDAP, I would get at least four months in Transitional Drug Abuse Treatment (TDAT), i.e. halfway-house time.  But, on IFRP refusal, "The inmate will not be placed in a community-based program."  IFRP P.S. at ch. 8 (quoting 28 C.F.R. Sec. 545.11(d)(8)).

Now I cannot imagine either the warden or regional director---or Aleph or the OIG or the national PREA coordinator or the Court ---would condone Eisele's latest tactic in response to my PREA complaints against Royer, Eisele **et al.**

But if nothing changes we have three options--
1) refuse to pay it, or simply do nothing, as my account does not have the funds to pay it, and risk litigating it;
2) deposit about $1,000 in my commissary account before Friday, December 30, 2022, as BOP could---and likely would---try to charge the payment as early as that day, given that January 1, 2023, is a holiday and a Sunday; or
3) pay the full $1,300 to the Clerk of Court in Boston, be sure to obtain a receipt **definitively identifying my name and case no. 16-cr-10305-NMG** and overnight the original receipt---not a photocopy, but the original receipt---to Eisele; **see** IFRP P.S. at ch. 8(b)(3)(a) (community payments to Court Clerk must be proved by original receipt, not a photocopy).

I note that despite the relevant statute, 34 U.S.C. Sec. 30307(b) (PREA standards apply to the Bureau of Prisons (BOP) with the force of law), and corresponding requirement to separate me from Royer, 28 C.F.R. Sec. 115.64(a)(1), nobody in the BOP has **ever** separated me from Royer.  My earlier transfer to Marion clearly wasn't for that purpose, because, had a formal separation between Royer and me been entered into the BOP's system, called SENTRY, I could not have been transferred

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------

back here while Royer remains.  And he does remain.  He was in the unit recently.

In fact, Royer has many accusers here.  He's never been separated from any of them.

I have done everything I know how to do to demand formal separation from Royer.  BOP simply refuses to follow the law and the attorney general's PREA standards.

Now Royer's chronies are---once again---extorting me for money.

I further note 28 C.F.R. Secs. 115.43, 115.68 (limiting segregation for victims of sexual abuse, requiring exhaustion of all other avenues).  I further note that Royer has and always had full access to the SHU here.  He helped bring the discipline charge against me for naming him to former **American Conservative** journalist Jordan Bloom this time last year, while I was in the SHU, awaiting transfer.

I plan to send you an electronic message everyday from here forward.  And I plan to advise the Court in **Rule**.  I at least want an evidentiary hearing if I am to be deprived RDAP credit.  Retaliatory deprivation of sentence credit or credit-earning classes violates due process.

Love always,
/s/ Marty.
-----Gottesfeld, Dana on 12/19/2022 3:02 PM wrote:

>

Received 12.18.22 at 9:07am

Hi love,

Rabbi Peretz Mockin
peretz@aleph-institute.org
347 610 6199
7304 Beverly Blvd #153
Los Angeles, CA 90036

He's been trying to get you moved out of the cmu. The regional director has or will be speaking to the warden. When warden gets request from regional director, decent chance he'll follow up. Request is going to come or has already come from warden to cpb. Cpb makes decisions. Mock was not aware of your new case.

Love
Dana

Sent Monday 12.19.22 at 12:14amest

MARTIN GOTTESFELD on 12/18/2022 8:05:41 AM wrote
1:10 P.M. Eastern Time, Thursday, December 15, 2022

My Darling Dana:

I have a few bozos loitering around my CORRLINKS contacts, pushing down the real-estate values.

Time for a little gentrification.

Toward that end, may I please have complete contact information, i.e. given name, surname, postal address, phone number and email address, for Chaim, or whoever is my optimal point of contact at Aleph?

Love always,
/s/ Marty.

Exh. 9

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO: Gottesfeld, Dana
SUBJECT: RE: RE: 2022-12-15|Aleph contact info?
DATE: 12/19/2022 07:48:38 PM

7:48 P.M. Eastern Time, Monday, December 19, 2022

My Darling Dana:

Please see my separate, more detailed and very urgent reply to this same message a few minutes ago.

If we do not have our phone call tomorrow at noon I would assume very foul play is afoot here in Indiana.

I appreciate very much you and Aleph.  Together you are quite a force, definitely more powerful together than separate.

Love always,
/s/ Marty.
-----Gottesfeld, Dana on 12/19/2022 3:02 PM wrote:

>

Received 12.18.22 at 9:07am

Hi love,

Rabbi Peretz Mockin
peretz@aleph-institute.org
347 610 6199
7304 Beverly Blvd #153
Los Angeles, CA 90036

He's been trying to get you moved out of the cmu. The regional director has or will be speaking to the warden. When warden gets request from regional director, decent chance he'll follow up. Request is going to come or has already come from warden to cpb. Cpb makes decisions. Mock was not aware of your new case.

Love
Dana

Sent Monday 12.19.22 at 12:14amest

MARTIN GOTTESFELD on 12/18/2022 8:05:41 AM wrote
1:10 P.M. Eastern Time, Thursday, December 15, 2022

My Darling Dana:

I have a few bozos loitering around my CORRLINKS contacts, pushing down the real-estate values.

Time for a little gentrification.

Toward that end, may I please have complete contact information, i.e. given name, surname, postal address, phone number and email address, for Chaim, or whoever is my optimal point of contact at Aleph?

Love always,
/s/ Marty.

Exh. 10

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------

FROM: 12982104
TO: Bolling, Eric; Brown, Benjamin; Brown, Greg; Camp, Frank; Daniel, Ted; Fortin, Lori; Gosztola, Kevin; Gottesfeld, Dana; Green, Jeremy; Grim, Ryan; Kiriakou, John; Malkin, Michelle; Mcbreen, Kelen; Mcmillen, Alexi; Newman, Alex; Pavlo, Walter; Shaffie Atty-At-Law, Shawn; Shaw, Carey M; Sweeney, Chris; Tesoriero, Celeste
SUBJECT: 2022-12-19|BOP is now extorting me for money
DATE: 12/19/2022 07:53:04 PM


7:52 P.M. Eastern Time, Monday, December 19, 2022

Dear Eric, Attorney Brown, Greg, Frank, Ted, Lori, Kevin, Dana, Attorney Green, Ryan, John, Michelle, Kelen, Lexi, Alex, Walter, Attorney Shaffie, Mitchell, Chris and Attorney Tesoriero:

Please be advised Bureau of Prisons Case Manager Ms. Rebekka Eisele is now extorting me for money in retaliation for, at least, 1) my reporting of her former manager, Mr. Todd Royer, under the Prison Rape Elimination Act (PREA); 2) my reporting of her for failure to separate Royer from me after Royer's sexual voyeurism, in violation of 28 C.F.R. Secs. 115.6, 115.64(a)(1); and 3) my litigation of **Gottesfeld v. Rule**, 2:22-cv-571-JRS-MJD (S.D. Ind.), to gain my freedom.

I'll send you each more later, if I'm able.

From the real-life **Chateau d'If**,
/s/ MartyG.

Exh. 11

To Wheeler, interim-IRO Ms. Jamie; S.I.S.
From Gottesfeld, Mr. Martin, Reg. no. 12982-104
2030 hrs. Wed., Dec. 21, 2022
Re Preservation of audio and video evidence

Salutations Ms. Wheeler and S.I.S.:

I kindly request the preservation of the following audio and video surveillance footage from FCI Terre Haute D-unit:

1) ca. 0927 hrs. Mon., Dec. 19, 2022, in the law library, showing my placement of each individual sheet of my mailing of my resubmission of admin. rem. 1120431-R, and my placement of the request for a timeliness memo hanging out from the manila envelope in the picture frame;

2) ca. 1045 hrs. Mon., Dec. 19, 2022, in the chow hall, my handing Wheeler the same manila envelope along with a written request and my dialogue with Wheeler and Eisele about the written request to the effect that central had told me to secure a timeliness memo. for that particular remedy;

3) ca. 1500 hrs. Mon., Dec. 19, 2022, in the law library, Eisele's conversation with me about the $1,300 per quarter IFRP contract Eisele presented to me, including my showing Eisele on the computer that my funds considered for FRP were $0.00 and her agreeing to provide me a copy of the signed contract, as well as her saying she used the "same forumula as before"; and

4) ca. 0945 hrs. Tue., Dec. 20, 2022, in the chow hall, my discussion with Eisele and Wheeler about my contacts being blocked, to include Wheeler's saying no paperwork whatsoever would be forthcoming to me regarding the blocking of the contacts and that Wheeler and the BOP would determine at their sole discretion which evidence to preserve for litigation.

In support of this request I note the Court's Order at § I, *Gottesfeld v. Lammer*, 2:20-cv-12-JRS-MJD (S.D. Ind.), dkt. 9 at 1 (the duty to preserve evidence arises whenever a party knows or should know that litigation is imminent).

I feel the evidence I requested above is relevant to the questions of retaliation and exhaustion in my case *Gottesfeld v. Rule*, 2:22-cv-571-JRS-MJD (S.D. Ind.). I anticipate presenting it to the Court to help the Court decide those questions.

If—for any reason—the above evidence may not be available, please advise me of such in writing as soon as practicable.

Very truly yours,

by: _____
    Martin Gottesfeld, Petitioner, *pro se.*

- PAGE 1 OF 1 -

Exh. 12

To Special Investigative Services; and interim-IRO Wheeler, Ms.
From Gottesfeld, Martin S., Reg. no. 12982-104
1516 hrs. Thu., Dec. 29, 2022
Re Preservation of audio and video evidence

Salutations S.I.S. and Ms. Wheeler:

I hope you are well.

I kindly request the preservation of the following audio and video surveillance footage from FCI Terre Haute D-unit:

1) ca. 0940 hrs. Wed., Dec. 21, 2022, in the chow hall, my conversation with Wheeler about requests to preserve evidence, preservation of evidence and the staff memo. for admin. rem. no. 1120431, containing Wheeler's statements to me about clarity of video of my placing documents in a manila envelope prior to mailing, that staff need not tell me whether they have actually included the timeliness memo. that I had requested in my remedy envelope when mailed and agreeing with me that remedy policy nowhere mentions or codifies any process whatsoever for staff timeliness memos.

In support of this request I note the Court's Order at § I, *Gottesfeld v. Lammer*, 2:20-cv-12-JRS-MJD (S.D. Ind.), dkt. 9 at 1 (the duty to preserve evidence arises whenever a party knows or should know that litigation is imminent).

I feel the above-requested evidence relevant to the questions of retaliation and exhaustion in my case *Gottesfeld v. Rule*, 2:22-cv-571-JRS-MJD (S.D. Ind.). I anticipate presenting it to the Court to help the Court decide those questions.

If—for any reason—the above evidence may not be available, please advise me of such in writing as soon as practicable.

Very truly yours,

by: 
 Martin Gottesfeld, Petitioner, *pro se.*

- PAGE 1 OF 1 -

Exh. 13

RECEIPT - ADMINISTRATIVE REMEDY

DATE: DECEMBER 20, 2022

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      NORTH CENTRAL REGIONAL OFFICE

TO  : MARTIN GOTTESFELD, 12982-104
      TERRE HAUTE FCI     UNT: CMU     QTR: D04-040L

THIS ACKNOWLEDGES THE RECEIPT OF THE REGIONAL APPEAL
IDENTIFIED BELOW:

REMEDY ID       : 1120386-R3
DATE RECEIVED   : DECEMBER 8, 2022
RESPONSE DUE    : FEBRUARY 6, 2023
SUBJECT 1       : DHO APPEAL - PROCEDURES
SUBJECT 2       :
INCIDENT RPT NO: 3552752

Recived printed upside down duplex on TU 2022-12-20
w. extension to 2023-02-06
by MJG

EXTENSION OF TIME FOR RESPONSE - ADMINISTRATIVE REMEDY


DATE: DECEMBER 20, 2022



FROM: ADMINISTRATIVE REMEDY COORDINATOR
      NORTH CENTRAL REGIONAL OFFICE

TO  : MARTIN GOTTESFELD, 12982-104
      TERRE HAUTE FCI     UNT: CMU     QTR: D04-040L



ADDITIONAL TIME IS NEEDED TO RESPOND TO THE REGIONAL APPEAL
IDENTIFIED BELOW.  WE ARE EXTENDING THE TIME FOR RESPONSE AS PROVIDED
FOR IN THE ADMINISTRATIVE REMEDY PROGRAM STATEMENT.


REMEDY ID       : 1120386-R3
DATE RECEIVED   : DECEMBER 8, 2022
RESPONSE DUE    : FEBRUARY 6, 2023
SUBJECT 1       : DHO APPEAL - PROCEDURES
SUBJECT 2       :
INCIDENT RPT NO: 3552752

*Recie'ved printed qrsite don duplex*
*TV 2022-12-23*
*by BG*

Exh. 1

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: DECEMBER 19, 2022

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      DESIG/SENTENCE COMPUTATION CTR

TO  : MARTIN GOTTESFELD, 12982-104
      TERRE HAUTE FCI     UNT: CMU     QTR: D04-040L
      4200 BUREAU ROAD NORTH
      TERRE HAUTE,  IN 47808

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID       : 1144715-R2     REGIONAL APPEAL
DATE RECEIVED   : DECEMBER 16, 2022
SUBJECT 1       : OTHER SENTENCE COMPUTATION
SUBJECT 2       :
INCIDENT RPT NO:

REJECT REASON 1: YOU SUBMITTED YOUR REQUEST OR APPEAL TO THE
                 WRONG LEVEL.  YOU SHOULD HAVE FILED AT THE
                 INSTITUTION,  REGIONAL OFFICE, OR  CENTRAL
                 OFFICE LEVEL.

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REMARKS         : PER PS 1330.18 ADMINISTRATIVE REMEDIES MUST FIRST BE
                  FILED AT THE FACILITY TO WHICH YOU ARE ASSIGNED AND
                  APPEALED TO THE REGION.

U.S. Department of Justice

**Regional Administrative Remedy Appeal**

Federal Bureau of Prisons

---

Type or use ball–point pen.  If attachments are needed, submit four copies.  One copy of the completed BP–DIR–9 including any attachments must be submitted with this appeal.

From: GOTTESFELD, MARTIN S.        12982-104        D        FCI-THA
_____
          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**Part A—REASON FOR APPEAL**

REC'D DEC 1 6 2022

PLEASE SEE CONTINUATION PAGE INCLUDED.

30 NOV. 2022 (WED.)
_____                    _____
          DATE                                              SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____                    _____
          DATE                                              REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

USP LVN      DATE        Previous editions not usable        SIGNATURE, RECIPIENT OF REGIONAL APPEAL        BP–230(13)
                                                                                                           APRIL 1982

U.S. Department of Justice                **Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball–point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP–DIR–9 and BP–DIR–10, including any attach-
ments must be submitted with this appeal.

| From: | GOTTESFELD, MARTIN S. | 12982-104 | D | FCI-THA |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL** I hereby appeal the incl'd rejection of rem. no. 1144715-R2. *See also* incl'd Time1. Memo.
"When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the
inmate may appeal the rejection, including a rejection on the basis of an exception as described in [28 C.F.R.] §542.14
(d), to the next appellate level." Prog. Stat. 1330.18 Administrative Remedy Program (Jan. 6, 2014) ("ARP P.S.") at ch.
11 (quoting 28 C.F.R. § 542.17(c)). My original Appeal to the DSCC, incl'd, stated: "[F]ormal administrative remedy re-
quests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with
the Bureau office which made the original decision" (quoting 28 C.F.R. § 542.14(d)(5)). "This is just such request; BOP'
Federal Time Credits (FTCs) auto-calculation application originated in and is overseen by the DSCC, and my single reques
is for the DSCC to adjust the auto-calculation of my FTCs to obey all laws[...]." *Id.* The DSCC's "REMARKS" are a final
denial at the regional level of the construal of the remedy under § 542.14(d)(5): "PER PS 1330.18 ADMINISTRATIVE REMEDI
MUST FIRST BE FILED AT THE FACILITY TO WHICH YOU ARE ASSIGNED AND APPEALED TO THE REGION." Rej. Ntc., incl'd. DSCC thus
made clear it will not process or reconsider processing the remedy as initially filed with DSCC. But DSCC is mistaken.
28 C.F.R. § 542.14(d)(5) trumps PS 1330.18.  Though subs. (d)(5) is omitted in PS 1330.18, the ELL includes (d)(5) and
also notes: "75 FR 34625, 34626, June 18, 2010, added paragraph (d)(5), effective June 18, 2010." *See* ELL print-out,
incl'd. My single request is thus for the central office to direct the DSCC to process the remedy as it was submitted,
pursuant to 28 C.F.R. § 542.14(d)(5), § 542.17(c) (cent. off. may "direct that the submission be accepted at the lower
level"). BOP's omission in PS 1330.18 of para. (d)(5) does not negate (d)(5) as a valid regulatory promulgation. Should
central reject this request then § 542.14(d)(5) becomes inoperative in this case and I will consider the matter exhauste

| 29 DEC. 2022 (THU.) ← SAME DAY I RECEIVED THE REJECTION. | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

| | |
|---|---|
| DATE | GENERAL COUNSEL |

ORIGINAL: RETURN TO INMATE              CASE NUMBER: _____

**Part C—RECEIPT**                      CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

SUBJECT: _____

| | |
|---|---|
| DATE | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL |

Printed on Recycled Paper           BP-231(13)
APRIL 1982

28 C.F.R.

### § 542.14  Initial filing.

**(a)** Submission. The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred.

**(b)** Extension. Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

**(c)** Form.

**(1)** The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).

**(2)** The inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue. For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.

**(3)** The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 1/2" by 11") continuation page. The inmate must provide an additional copy of any continuation page. The inmate must submit one copy of supporting exhibits. Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.

**(4)** The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional counselor). CCC inmates may mail their Requests to the CCM.

**(d)** Exceptions to Initial Filing at Institution.

**(1)** Sensitive Issues. If the inmate reasonably believes the issue is sensitive and the

CFR2

1

From the Electronic Law Library (ELL)

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

12982104

inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

(2) DHO Appeals. DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.

(3) Control Unit Appeals. Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.

(4) Controlled Housing Status Appeals. Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.

(5) Other requests for formal review of decisions not originating from the Warden. Other than the exceptions listed above, formal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision, and appealed directly to the General Counsel.

**HISTORY:** [44 FR 62250, Oct. 29, 1979; 58 FR 58246, Oct. 29, 1993; 61 FR 86, 88, Jan. 2, 1996; 75 FR 34625, 34626, June 18, 2010]

[EFFECTIVE DATE NOTE:

75 FR 34625, 34626, June 18, 2010, added paragraph (d)(5), effective June 18, 2010.]

CFR2                                                    2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

